# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Hector Jorge ARECO, Veronica BALBIANI, Sonia Maricel BARAVALLE, Claudio Bruno BARTOLI, Torcuato Luis BATTAGLIA, Gonzalo BLAQUIER, Maria Teresa BORRELL FORTUNY, Nicolas Eduardo BOWEN, Paz Veronica CHARTIER CAMPAGNE, Maria Candela D'ANGELO, Maria DeMIGUEL, Maria Cristina FABRICANT, Daniel Floreal FOGNINI, Martina GALLI, Luis Maria GAMES, Jorge Noberto GARCIA COZZI, Carlos Alfredo GRIMALDI, Diego GRIMALDI, Cecilia INCHAUSTI, Dante LEONE, Mirta Edit LONGHINI, Jorge Carlos MACELLARO, Alejandro MOLINA CARRANZA, Monica Patricia MORENA, Alicia S. NEGREIRA, Adriana Mabel NIETO, SAN GOAL, Osvaldo H. SCANDOLA, Norberto Rene SERENELLI, SOUTHERN SERVICES COMPANY CORP., Maria Laura TRAVELLA, YORK VENTURE CAPITAL, Maria Fabiana ZANELLI | ) CIVIL ACTION NO.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **ORIGINAL COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs | )<br>) |
| vs. | )<br>) |
| ATC REALTY FIFTEEN, INC., WELLS FARGO BANK, N.A., WELLS FARGO BANK NORTHWEST, N.A., WELLS FARGO DELAWARE TRUST COMPANY, THE LIFETRADE FUND, B.V., LIFETRADE MANAGEMENT COMPANY, LLC, LIFETRADE MANAGEMENT COMPANY, N.V., LIFETRADE ASSET MANAGEMENT, N.V., LIFETRADE LIFE SETTLEMENTS LIMITED, LT INVESTMENTS, INC., L TRADE PLUS LTD; L TRADE FIXED CAPITAL LTD (BVI); PORTSMOUTH SETTLEMENT COMPANY I, LLC, PORTSMOUTH SECURITIES | )<br>)<br>)<br>)<br>) **JURY TRIAL DEMAND**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

LIMITED, ROY G. SMITH, JOHN     )
MARCUM, TMF CURACAO N.V.,     )
S&P GLOBAL, INC., and ITM     )
TWENTYFIRST, LLC,     )
          )
    Defendants     )
          )

## ORIGINAL COMPLAINT

Plaintiffs bring this action as a companion action to *Aviles et. al. v. S&P Global Inc. et a.l*, No. 1:17-cv-02987-JPO, *Benedetto et al. v. S&P Global Inc. et al.*, No: 1:17-cv-06087-JPO, *Acebedo v. S&P Global Inc. et al.*, No: 1-17-cv-07034-JPO; and *Alvarez et al., v. S&P Global Inc. et al.*, No: 1-18-cv-00128-JPO on the docket of this Court. Plaintiffs are members of the putative class asserted in *Aviles*, and adopt and incorporate by reference the class action allegations and derivative allegations made in the *Aviles* Second Amended Class Action Complaint. Plaintiffs assert herein their individual claims arising out of the same transactions and occurrences as the *Aviles*, *Benedetto*, and *Acebedo* actions.

Plaintiffs assert claims herein against (1) ATC Realty Fifteen, Inc. ("ATC"), Wells Fargo Bank, N.A., Wells Fargo Bank Northwest, N.A., and Wells Fargo Delaware Trust Company (hereinafter collectively the "Wells Fargo Defendants" or "Wells Fargo"); (2) the Lifetrade Fund, B.V., Lifetrade Management Company, LLC, Lifetrade Management Company, N.V., Lifetrade Asset Management, N.V., Lifetrade Life Settlements Limited, LT Investments, Inc., L Trade Plus Ltd, L Trade Fixed Capital (BVI) Ltd, Portsmouth Settlement Company I, LLC, Portsmouth Securities Limited, Roy G. Smith, John Marcum and TMF Curacao N.V., ("Equity Trust") (hereinafter collectively the "Lifetrade Defendants"); (3) S&P Global, Inc. (hereinafter "S&P"); and (4) ITM Twentyfirst, LLC, (hereinafter "21st Services"), as more fully set forth below:

## INTRODUCTION

1.    Plaintiffs seek to set aside a fraudulent conveyance by which the Lifetrade Fund, B.V. ("Lifetrade"), an offshore life settlement fund, was rendered insolvent by a transfer of all of its assets to ATC,[1] under the terms of a Settlement Agreement attached as Exhibit 1.   This transfer was made for no consideration other than a pre-existing debt owed to Wells Fargo, that was significantly less than the value of the property transferred, and certainly less than "fair consideration" within the meaning of N.Y. Debt. & Cred. Law §§ 274, 276.   Plaintiffs also seek a money judgment against all parties responsible for their investment losses, including the Lifetrade Defendants, the Wells Fargo Defendants, S&P, and 21st Services.

2.    The Plaintiffs are offshore investors who lost the entirety of their investments – collectively many millions of dollars – in the Lifetrade Fund.[2]   They were misled in the first instance by the Lifetrade Defendants and S&P to believe that life settlements are a safe asset class, comparable to investment-grade corporate bonds, which could be used by investors to reduce risk through diversification.   Knowing that Plaintiffs and their investment advisors would rely upon S&P's high ratings as an important, if not essential, consideration in determining to invest, S&P for years issued false and misleading ratings that reported on the fund's net asset

---

[1] ATC is a subsidiary of Wells Fargo Bank.
[2] A schedule detailing certain information concerning each Plaintiff's investment, including date, amount invested, and class of shares is set forth at Schedule A.  To the extent that the investment date is described in the Schedule as "under investigation," it is specifically alleged herein, upon information and belief, that the investment occurred between 2006 and 2011.  To the extent that the amount invested amount or class of shares purchased is described in the Schedule as "under investigation," it is specifically alleged herein, upon information and belief, that the Plaintiff invested some amount of money in one or more of the Lifetrade entities.  More specific information will be provided as it becomes available, either through counsel's investigation or through discovery.  On or about July 26, 2017, Plaintiffs' counsel initiated a petition for the attachment of evidence in the Curacao courts against Defendant TMF and HBM Management (the two administrators of the Lifetrade fund), seeking the production of certain Lifetrade documents.  After hearing argument, the Curacao court granted Plaintiffs' petition as to HBM on or about November 16, 2017 and as to TMF on or about November 23, 2017.  The documents sought were thereafter and only recently made available to counsel, and are presently under review.  It is believed that these documents will contain additional information as to the investments made by individual Lifetrade shareholders.  In any event, precise information concerning each Plaintiff's investment is already known to and preserved in the records of the Lifetrade Defendants, including Smith and Marcum.

value and "performance." It did so without performing any due diligence on the valuation methods used, and without disclosing that it had privately concluded that life settlement funds of this sort are incapable of being rated.

3.    Life settlements are, in fact, an illiquid and high-risk class of investments, as S&P conceded in a 2009 paywall-protected report that it concealed from the Plaintiffs (Exhibit 2).

4.    Plaintiffs were further misled by Defendant 21st Services, Lifetrade's exclusive provider of life expectancy evaluations ("LEs"), which for years deliberately and falsely understated the life expectancies of insureds in the Lifetrade portfolio by a factor of at least 22%. 21st Services knew that these false life expectancy statements were being touted to investors both through S&P and Lifetrade as evidence of the value of the Fund's assets, and as the reason investors could expect a robust return on their investment.    21st Services conspired with Defendant Smith and the other Lifetrade Defendants by providing fraudulent LE reports, which contained LE projections that 21st Services knew or should have known were being disseminated to investors and potential investors and their advisors, and upon which they would rely in making investment decisions.

5.    With a critical mass of investors, including Plaintiffs, duped by the Lifetrade Defendants, S&P, and 21st Services into investing substantial sums, Defendants Smith and Marcum sought and obtained a substantial credit facility from Wachovia Bank, ostensibly to acquire more policies.    In reality, Defendants Smith and Marcum, in breach of their fiduciary duties, used Lifetrade's borrowing, and the falsely overvalued policies by 21st Services, in order to skim at least $100 million and potentially in excess of $200 million in self-dealing commissions and fees from Lifetrade.

6.    After Wachovia's failure in the 2008 financial crisis, Wells Fargo acquired the

Lifetrade loans. By 2010, and contrary to public statements, Wells Fargo had internally determined that it wished to maintain and operate its own primary life settlement business (as opposed to acting as lender). In furtherance of that goal, Wells Fargo embarked upon a scheme to assume outright ownership of Lifetrade's entire portfolio of assets, stripping the Fund and its investors of hundreds of millions of dollars of equity. Ultimately, this was accomplished on August 14, 2012, when Wells Fargo and the Lifetrade Defendants signed an unconscionable Settlement Agreement (Exhibit 1). That document provided for the fraudulent conveyance to ATC, for the benefit of Wells Fargo, of the entire life insurance portfolio of Lifetrade. The policies transferred had a face value at maturity of approximately $905,000,000 and a present value of as much as $451,000,000, and were ostensibly transferred to satisfy a debt to Wells Fargo of only approximately $205,000,000.

7.   The Wells Fargo Defendants were unjustly enriched by hundreds of millions of dollars as the result of this fraudulent conveyance. Moreover, at Wells Fargo's insistence, Smith and Marcum agreed to the release of all claims that shareholders, including Plaintiffs and the Plaintiff class, had or may have against Wells Fargo. And, as part of the corrupt bargain, Lifetrade's managers, Defendants Smith and Marcum, were released from personal liability for the Wells Fargo debt, to the detriment of the investors, to whom they owed fiduciary duties.

8.   Not only did the Wells Fargo Defendants and the Lifetrade Defendants rob Plaintiffs and other investors of the entirety of their investments, but they conspired to and did conceal this fact from Plaintiffs, thus preventing Plaintiffs from learning of their losses sooner. Indeed, the Settlement Agreement specifically precluded the Lifetrade Defendants from making "any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement."

9.     Of no small significance, the Agreement also concealed from Plaintiffs any facts that might inform them of the motivations behind Defendants' collusive deal. It expressly precluded any statements to investors "relating to the state of mind, motivation, actions or inactions" of the Wells Fargo Defendants.

10.     Accordingly, until November 2016, Plaintiffs were misled into believing that Wells Fargo's takeover of the Fund's portfolio was temporary, that refinancing was imminent, and that their investments would be protected.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because this is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class or mass action in which at least one member of the class of plaintiffs is a citizen or subject of a foreign state and at least one defendant is a citizen of a state. The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises in part under the laws of the United States, in particular 18 U.S.C. 1961, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In addition, Plaintiffs invoke, if necessary, the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367 in that all claims asserted herein arise from the same misconduct and form part of the same case or controversy.

12.     This Court has personal jurisdiction over the RICO Defendants (defined *infra* as Smith, Marcum, and the Wells Fargo Defendants) pursuant to 18 U.S.C. § 1965(b) and (d) because they can be found in, reside, have an agent, or transact or have transacted business within the United States.

13.     The Wells Fargo Defendants, and all of the Lifetrade Defendants, with the exceptions of Lifetrade Management Company, LLC, Portsmouth Settlement, and Portsmouth

Securities, are known to have signed various loan documents and the Settlement Agreement of August 14, 2012, which provided that any state or federal court located within the city of New York has exclusive jurisdiction in connection with any action or proceeding arising out of or relating to the loan agreements or the Settlement Agreement.[3] Those defendants further waived any objection based on *forum non conveniens* and any objection to venue of any action instituted in any of the aforementioned courts and consented to the granting of such legal or equitable relief as is deemed appropriate by this Court.[4]

14.    This Court also has personal jurisdiction over the Lifetrade Defendants pursuant to N.Y. CPLR § 302(a) because they have individually, and as a group acting in concert and under the direction and control of Smith, who is the alter ego of the corporate entities, transacted business at issue herein in the State of New York (1) by purchasing life insurance policies on the lives of New York residents; (2) by entering into an origination agreement with Abacus Settlements, LLC, a life settlement provider located at 708 Third Ave in New York; (3) by entering into escrow agreements with New York banks, including Bank of New York, to serve as the escrow agent for various life settlement transactions; (4) by hiring and compensating New York banks, including Bank of New York, to provide various services in connection with the fund, including the services of custodian, collateral agent and verification agent; (5) by contracting with New York Banks, including Bank of New York, to maintain custody of the fund's portfolio of policies in a lock box located in New York; (6) by hiring New York counsel to provide advice concerning the loan, settlement and other documents; (7) by hiring and

---

[3] Wells Fargo's Notification of Proposal to Accept Collateral in Strict Foreclosure (Exhibit 30) as well as the Bill of Sale (Exhibit 31), which were documents executed by the parties effectuating the fraudulent transfer of assets to Wells Fargo, each expressly provide that New York law governs such agreements. In addition, each of the parties to the strict foreclosure notice (Exhibit 30) consented to the jurisdiction of any state or federal court in the City of New York.

[4] Lifetrade Management Company, LLC, Portsmouth Settlement, Portsmouth Securities, Roy Smith, and John Marcum may have signed agreements as yet unknown to Plaintiffs that elect the state or federal courts of the City of New York as courts of exclusive jurisdiction for this matter.

compensating New York counsel to represent them in the courts of New York in connection with life settlement disputes; (8) by opening and maintaining checking accounts on New York banks, including Bank of New York; (9) by sending and receiving investment funds and payments for operating and management expenses through correspondent or intermediary banks located in New York, including Bank of New York, Wachovia NY, ABN-AMRO NY, UBS AG NY, Citibank NA, and Bankers Trust; (10) by entering into foreign exchange transactions with New York banks, including Bank of New York; (11) by issuing stock and periodic account statements to New York custodial banks, including UBS AG NY, for the benefit of offshore investors; and (12) by participating in various lender and investor meetings in the City of New York relating to the subject matter of this lawsuit. In particular, Marcum – acting in concert with, and as an agent for and under the direction and control of Smith and the other Lifetrade Defendants, who are Smith's alter egos – met with representatives from Lifetrade's largest investor in New York City to specifically discuss the business of the Fund on at least two occasions, in October 2012 and on August 29, 2013. At this meeting, Marcum led investors to believe that the Lifetrade debt would be imminently refinanced, and that their investments were protected. Moreover, Marcum – acting in concert with, and as an agent for and under the direction and control of Smith and the other Lifetrade Defendants, who are Smith's alter egos – met with investment advisor Pedro Nowald at a restaurant on Fifth Avenue in New York City at some point between 2007 and 2010 for the purpose of obtaining investments in Lifetrade from Nowald's clients. Marcum also came to New York City a number of times between 2007 and 2008, acting in concert with, and as an agent for and under the direction and control of Smith and the other Lifetrade Defendants, who are Smith's alter egos, to meet with bank officers concerning negotiation of the Wachovia Loan and Security Agreement and various custody, verification and other agreements with Bank of

8

New York. These meetings, the precise dates of which are presently under investigation, took place at Wachovia's offices at 375 Park Avenue and/or 1 Wall Street in Manhattan.

  15. This Court has personal jurisdiction over Defendant 21st Services pursuant to N.Y. CPLR § 302(a) because that Defendant affirmatively availed itself of the protections of New York law by performing services relating to the issuance of life expectancy certificates on New York insureds whose policies formed a substantial and material bulk of the Lifetrade portfolio. In order to perform these services, it would have been necessary and required for 21st Services or its agent to submit HIPAA authorizations to medical providers within the State of New York to procure the medical records required to evaluate the life expectancy and mortality of any particular insured. Thus, many of the misrepresentations at issue are directly related to activities in the State of New York, and in fact, 21st Services thus expected or should have expected that its conduct would be governed by the laws of the State of New York.

  16. This Court has personal jurisdiction over Defendant S&P Global because that Defendant has its principal place of business in this District, and because the ratings at issue in this case were issued out of S&P's New York office.

  17. Venue is proper in this district because Defendant S&P has its principal place of business in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district or arise from the loan and/or settlement agreements at issue herein, which selected the state or federal courts of the City of New York as the exclusive venue for this action and waive any objections based upon venue or *forum non conveniens*.

<b><u>PARTIES</u></b>

<b><u>The Plaintiffs</u></b>

18.    The Plaintiffs[5] are described and identified as follows:

a.    Plaintiffs Hector Jorge Areco, Veronica Balbiani, Sonioa Maricel Baravalle, Claudio Bruno Bartoli, Gonzalo Blaquier, Torcuato Luis Battaglia, Maria Teresa Borrell Fortuny, Nicolas Bowen, Paz Veronica Chartier Campagne, Maria Candela D'Angelo, Maria De Miguel, Maria Cristina Fabricant, Daniel Floreal Fognini, Luis Maria Games, Jorge Norberto Garcia Cozzi, Carlos Alfredo Grimaldi, Diego Grimaldi, Cecilia Inchausti, Dante Leone, Mirta Edit Longhini, Jorge Carlos Macellaro, Monica Patricia Moreno, Alicia S. Negreira, Adriana Mabel Nieto, Osvaldo H. Scandola, Norberto Rene Serenelli, Maria Laura Travella, Mariana Fabiana Zanelli are citizens of the foreign state of Argentina.

b.    Plaintiff Southern Services Company Corp. is a corporation organized under the laws of the foreign state of Chile with principal place of business in Chile.

c.    Plaintiffs San Goal and York Venture Capital are corporations organized under the laws of the British Virgin Islands with principal places of business in the British Virgin Islands.

---

[5] As noted above, Lifetrade was offered to offshore investors only. American investors were specifically excluded in order to avoid compliance with U.S. securities laws. Upon information and belief, all of the Plaintiffs herein, and in the two companion actions identified *supra* at ¶ 1, and/or their investment advisors, were solicited as investors by Lifetrade's sales force in Argentina which is believed to have been led by Florencio Menceyra, with one exception. The Plaza Asset Management and Iject Plaintiffs in the *Benedetto* complaint were solicited by Lifetrade's sales force in Japan. In targeting Argentine and Japanese investors, including Plaintiffs, Lifetrade trained and deployed a sales force in each of those countries to promote the Fund to investors and investment advisors. Plaintiffs and/or their investment advisors had contact with Lifetrade's foreign salespersons, or learned of the Fund through the efforts of Lifetrade's sales force. Plaintiffs were solicited through these foreign Lifetrade salespersons, and their investments in Lifetrade were the product of Lifetrade's promotional efforts in Argentina and (specifically with regard to Plaza Asset Management, Ltd. and Iject, which are each *Aviles* class member and individual Plaintiffs in the *Benedetto* action) in Japan. None of the Plaintiffs purchased their Lifetrade shares in the United States.

**Defendant ATC**

19.    Defendant, ATC Realty Fifteen, Inc. (hereinafter "ATC"), is a California corporation which may be served with process herein via mail pursuant to the New York long arm statute at its principal place of business, 420 Montgomery Street, San Francisco, California, 94163. ATC is a subsidiary of Wells Fargo and was the transferee on August 15, 2012, without fair consideration, of the life insurance policies of Lifetrade under the terms of the Settlement Agreement dated August 14, 2012, attached as Exhibit 1.

**The Wells Fargo Defendants**

20.    Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is a national banking association doing business in New York, and having its principal place of business in San Francisco, California, which may be served with process herein through any officer of the bank. Wells Fargo and its affiliates occupied several conflicting roles in relation to the Lifetrade Fund, including secured lender, hedge counterparty, trustee, custodian, administrative agent, escrow agent and verification agent.

21.    Defendant Wells Fargo Bank Northwest, N.A., formerly known as First Security Bank of Idaho, N.A. (hereinafter "Wells Fargo Utah"), is a national banking association that serves foreign nationals and maintains its principal place of business at 299 South Main Street, 12th Floor, MAC U1228-120, Salt Lake City, UT 84111. It may be served with process herein through any officer of the bank. Wells Fargo Utah was one of the two co-trustees, along with Wells Fargo Delaware, who held legal title as a fiduciary to the life insurance policies of Lifetrade.

22.    Defendant Wells Fargo Delaware Trust Company (hereinafter "Wells Fargo Delaware"), is a Delaware corporation which may be served with process herein at 919 Market

Street, Suite 1600, Wilmington, Delaware 1980. Wells Fargo Delaware was one of the two co-trustees, along with Wells Fargo Utah, who held legal title as a fiduciary to the life insurance policies of Lifetrade.

**The Lifetrade Defendants**

23.    Defendant Lifetrade Fund, B.V. ("Lifetrade" or the "Fund") is a Netherlands Antilles (Curacao) limited company which may be served with process herein through its agent for service of process, CT Corporation System, 111 Eighth Ave., New York, NY 10011. Lifetrade was at all relevant times controlled by Defendant Smith as its founder, and sole voting stockholder.   Lifetrade acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

24.    Defendant Lifetrade Management Company, LLC ("LMC LLC") is a Delaware limited liability company that may be served with process herein via mail pursuant to the New York long arm statute through its member-manager, Roy Smith, at 115 Pebble Beach Drive, Fayetteville, GA 30215.  LMC LLC held various positions relating to Lifetrade, including the lucrative position of investment manager for a period of time, which allowed LMC LLC to skim off a substantial portion of the assets of Lifetrade. LMC LLC was, at all times relevant herein, controlled by Defendant Smith as his alter ego.  Smith indirectly owned 80% of the membership interests in LMC LLC through entities known as Longevity Investments, LLC and Longevity Partners, LLC and 20% through his henchman Marcum, who was given a share of the profits of the fraud in return for his loyalty and services rendered in carrying out the scheme in accordance with Smith's directives. LMC LLC acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein .

25.    Defendant Lifetrade Management Company, N.V., ("LMC NV") is a Netherlands

Antilles (Curacao) limited company that may be served with process herein through the Hague Convention at its last known address, c/o HB Management, N.V. Emancipatie Boulevard 31, Curacao, Dutch Caribbean. LMC NV served in various capacities with the Lifetrade Entities, including servicer of its policies during the period 2008 through 2010, managing director of Lifetrade during the period 2008 to 2017 and Lifetrade's administrator during the period 2008 and 2009, in which capacity it was responsible for calculating the net asset value ("NAV") of the fund using a fraudulent straight-line method discussed below. LMC NV also served as investment manager of the fund from 2008 through 2010, a lucrative position by which it was able to skim off a substantial portion of the fund's assets. LMC NV was, at all times relevant herein, controlled by Defendant Smith as his alter ego. Smith initially owned 100% of the stock of LMC NV indirectly through other entities such as Portsmouth Securities LTD, and later owned 80% of the stock indirectly through entities known as Longevity Investments, LLC and Longevity Partners, LLC and 20% through his henchman Marcum, who was given a share of the profits of the fraud in return for his loyalty and services rendered in carrying out the scheme in accordance with Smith's directives. LMC NV acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

26.    Defendant Lifetrade Asset Management, N.V. ("LAM NV") is a Netherlands Antilles (Curacao) limited company that may be served with process herein its agent for service of process, CT Corporation System, 111 Eighth Ave., New York, NY 10011. LAM NV served as the Servicer and one of two Collateral Managers of the fund between 2010 and 2012. It is also believed to have served as investment manager of the fund from 2010 through 2012, a lucrative position by which it was able to skim off a substantial portion of the fund's assets. LAM NV was, at all times relevant herein, controlled by Defendant Smith as his alter ego. Smith

owned 80% of the stock directly and 20% through his henchman Marcum, who was given a share of the profits of the fraud in return for his loyalty and services rendered in carrying out the scheme in accordance with Smith's directives. LAM NV acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

27.    Defendant Lifetrade Life Settlements Limited ("Lifetrade Ireland") is an Irish company that may be served with process herein through the Hague Convention at 2nd Floor, Beaux Lane House, Mercer Street Lower, Dublin 2, Ireland. Lifetrade Ireland was the beneficial owner of the Lifetrade policy portfolio under the terms of the tax reorganization of Lifetrade that occurred in 2011. Lifetrade Ireland was, at all times relevant herein, controlled by Defendant Smith and was an alter ego of the Lifetrade Fund. Lifetrade Ireland acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

28.    Defendant LT Investments, Inc. ("LT Investments"), is a Delaware corporation, and may be served with process herein via mail pursuant to the New York long arm statute addressed to its chief executive officer, Roy Smith at 115 Pebble Beach Drive, Fayetteville, GA 30215. LT Investments was the holder of certain life insurance policies under the terms of the tax reorganization that occurred in 2011. LT Investments was, at all times relevant herein, controlled by Defendant Smith, who was its sole stockholder. LT Investments acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein..

29.    Defendant Portsmouth Settlement Company I, LLC, ("Portsmouth Settlement") is a Georgia limited liability company with its principal place of business at 101 Beckett Lane, Suite 101, Fayetteville, Georgia 30214. It may be served with process herein through its registered agent, Charles H. Davis, Jr., 7 NW Broad Street, Fairburn, Georgia 30213. Portsmouth Settlement, which was the principal life settlement provider to Lifetrade, has done

extensive life settlement business in the State of New York, is registered with the New York Insurance Department and has purposely availed itself of the protections of the laws of the State of New York in connection with the matters at issue herein by filing suit over a life settlement matter in the case of *Portsmouth Settlement Co. I, LLC v. Aviva USA Corp.*, 28 Misc.3d 1219(A) (2010). Portsmouth Settlement was, at all times relevant herein, controlled by Defendant Smith, who owned, indirectly, 100% of its stock and was its alter ego. Portsmouth Settlement acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

30.     Defendant Portsmouth Securities Limited ("Portsmouth Securities") is a Malaysian corporation with its principal place of business at Jalan Bahasa, Labuan, Federal Territory of Labuan, Malaysia. It was formerly known as Trading and Investment Management, Limited (Labuan), TIM, SL (Andora) and Continental Guaranty (Labuan) Limited. It may be served with process herein pursuant to the Hague Convention at its principal office or the residence of its sole office, director and shareholder, Roy Smith, at 115 Pebble Beach Drive, Fayetteville, GA 30215. Portsmouth Securities acquired from Smith 100% of the voting stock of Lifetrade and otherwise acted as the personal holding company and alter ego of Smith. Throughout the time periods at issue herein, Portsmouth Securities served as the distributor of the securities of Lifetrade, LT Fixed Capital (BVI) Ltd and LTrade Plus Ltd, a role pursuant to which it was paid undisclosed commissions of 10% of all amounts invested in the funds by investors. Portsmouth Securities also served as the Investment Manager and Hedge Counterparty for the Lifetrade Fund, roles pursuant to which it was paid, respectively, 2% of the fund's net assets annually and 6% of the of the fund's Japanese net assets annually, a combined total of approximately $20 million annually, exclusive of commissions, which comprised another $46

million over the life of the fund. Portsmouth Securities and its predecessors were at all times relevant herein, controlled by Defendant Smith, who owned 100% of its stock and was its alter ego, although he may have shared a portion of the corporation's revenues with a relative, Michael Smith, who served as a director thereof for at least a portion of the times at issue herein. Portsmouth Settlement acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

31.    Defendant LTrade Plus Ltd. ("LTrade Plus") is a British Virgin Islands limited company with its principal place of business at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands. LTrade Plus may be served with process through the Hague Convention at the same address. LTrade Plus was a "feeder fund" which raised capital from investors, 100% of which was invested in Lifetrade. On information and belief, Smith and/or Portsmouth Securities owned 100% of the voting securities of LTrade Plus in an arrangement identical to Lifetrade's ownership. Ltrade Plus acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

32.    Defendant LTrade Fixed Capital (BVI) Ltd. ("LTrade Fixed") is a British Virgin Islands limited company with its principal place of business at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands. LTrade Fixed may be served with process through the Hague Convention at the same address. LTrade Fixed was a "feeder fund" which raised capital from investors, 100% of which was invested in Lifetrade. On information and belief, Smith and/or Portsmouth Securities owned 100% of the voting securities of LTrade Fixed in an arrangement identical to Lifetrade's ownership. Ltrade Fixed acted in concert with and conspired with the other Lifetrade Defendants concerning the matters at issue herein.

33.    Defendant Roy G. Smith (hereinafter "Smith") is a citizen of the United Kingdom

and may be served with process herein at his principal residence, which is located at 115 Pebble Beach Drive, Fayetteville, GA 30215. Prior to founding Lifetrade in 2004, Smith was an undischarged bankrupt who, having acted as the director of a UK company between July 29, 1998 and October 25, 2000, was convicted of the criminal offense of Undischarged Bankrupt Acting as a Director, for which he was sentenced to 200 hours of community service and barred from being a company director in the UK for a period of three years,[6] a matter he never disclosed to investors in the Lifetrade Fund, despite touting his investment acumen as the fund's founder and *de facto* investment manager. After founding the fund, Smith arranged at various times for his corporate entities, Portsmouth Securities, LMC NV, and LMC LLC to hold contracts as investment manager or consultant to the Lifetrade Fund, depending upon the vessel into which he wished to funnel the vast revenues resulting from these contracts from time to time. Smith initially held all of the Class B voting stock of Lifetrade, which was the only class of stock that had voting rights, but he eventually transferred that stock to his personal holding company and alter ego, Portsmouth Securities. Smith also served as one of the controlling directors of most of the Lifetrade Defendants, some of which in turn served as directors or investment managers of the Lifetrade Entities. Upon information and belief, through fees, commissions and other charges by Portsmouth Settlements, Portsmouth Securities, LMC NV, LMC LLC, and LAM NV, Smith fraudulently skimmed off at least $100 million and potentially in excess of $200 million

---

[6] *See* judgment of South East Surry Magistrates Court entered on March 30, 2010. This conviction was based upon Section 11 of the UK Company Directors Disqualification Act of 1986, which provides that: "[i]t is an offence for a person who is an undischarged bankrupt to act as director of, or directly or indirectly to take part in or be concerned in the promotion, formation or management of, a company, except with the leave of the court." Smith's disqualification was subsequently voided on appeal to the Guildford Crown Court based upon Smith's representations that the bar on serving as a director would impose a hardship because it would make it difficult for him to obtain a visa to rejoin his wife and family in the United States and based upon the representation also that he had no intention to and would not serve as a director in the UK. Smith did not disclose to the Court, however, that he was currently serving as a director of several of the Lifetrade defendants. He represented to the Court that he was solely a passive stockholder in three companies in the United States. Smith was also convicted at the same time of the offense of Failing to Surrender to Custody at the Appointed Time, an offense for which he was sentenced to 40 hours community service.

from the Lifetrade Fund. He made huge, undisclosed profits through these entities not only when Lifetrade bought life insurance policies (through commissions and markup of 20% to 25%), but also when it distributed securities to investors to raise funds for the purchase of those policies (through sales commissions of 10%) and every year thereafter for supposed duties of "investment management" and "currency hedging," (fees of approximately 8% per annum) until 2012 when the Lifetrade fund, understandably, began to run out of money and Wells Fargo took advantage of its liquidity problems. Smith treated all of the corporate Lifetrade Defendants as his alter egos, ignoring corporate formalities, holding no director or shareholder meetings, moving funds between himself and these entities at will, entering into related-party contracts as the representative of both parties, and agreeing to commissions, fees and other contract terms that would never have been approved in arms-length negotiations between unrelated parties. Through his concerted action with, conspiracy with, and *de facto* control over his alter-ego entities and the other Lifetrade Defendants, Smith has engaged in all of the contacts with the State of New York set forth in detail above in Paragraph 14 and has thereby purposely availed himself of the protections of the laws of the State of New York with respect to the specific matters at issue herein.

34.     Defendant John Marcum is a citizen of the state of Connecticut and may be served with process herein at 18 Linnea Lane, Killingworth, Connecticut 06419-2436. Marcum is Smith's henchman and confident who, for loyalty and services rendered in carrying out Smith fraudulent scheme, was rewarded with a 20% interest in LMC NV, LMC LLC, and LAM NV. Marcum served as one of the controlling directors of many of the Lifetrade Defendants, some of which in turn served as directors or investment managers of the Lifetrade Entities. He was the chief marketing officer for the Lifetrade Entities and was in charge of investor communications.

Through his concerted action with, conspiracy with and aiding and abetting of Smith and the other Lifetrade Defendants, Marcum has engaged in numerous life settlement transactions in the State of New York, and as noted above, has held at least two investor meetings as well as lender meetings relating to the Fund in the City of New York, and has thereby purposely availed himself of the protections of the laws of the State of New York with respect to the specific matters at issue herein.

35.     Defendant TMF Curacao N.V., formerly known as Equity Trust (Curacao) N.V. (hereinafter "Equity Trust") is a Netherlands Antilles limited company that may be served with process herein through the Hague Convention at Pietermaai 15, Willemstad, Curacao.   Equity Trust was Lifetrade's Administrator from 2006 through 2009, either directly or as a managing director of LMC NV, which served as Administrator for a part of this period.   As such, Equity Trust was responsible for calculating the NAV of the fund using a fraudulent straight-line method discussed below. Equity Trust also served from 2003 until approximately 2008 as Lifetrade's first managing director and, from 2010 to June 2012 as a managing director of LMC NV which, in turn, was a managing director of Lifetrade from 2008 through the present.   In that capacity, Equity Trust executed various loan agreements that elected the state or federal courts of the City of New York as the exclusive jurisdiction for this suit.   Equity Trust acted in concert with, conspired with and aided and abetted the other Lifetrade Defendants and, as such, Equity Trust has thereby purposely availed itself of the protections of the laws of the State of New York with respect to the specific matters at issue herein.

**Defendant S&P**

36.     Defendant S&P Global, Inc. is a New York corporation formerly known as The McGraw-Hill Companies, Inc.  It has its principal place of business in New York, New York and

may be served with process herein through its general counsel at 55 Water St., 47th Fl., New York, NY 10041.

**Defendant 21st Services**

37.    Defendant ITM Twentyfirst, LLC, (hereinafter "21st Services"), was formerly known as 21st Services, LLC and 21st Services Acquisition, LLC.  It is a Delaware limited liability company with its principal place of business in the State of Minnesota, and may be served with process herein through its New York agent for service of process, Corporation Service Company, 80 State Street, Albany, New York 12207.    21st Services provided underwriting services to settlement providers and, from Lifetrade's inception in 2004 until 2012, provided all of Lifetrade's LE projections.  21st Services acted in concert with, conspired with and aided and abetted the other Lifetrade Defendants and, as such, 21st Services has thereby purposely availed itself of the protections of the laws of the State of New York with respect to the specific matters at issue herein.

## THE LIFETRADE ENTITIES

38.    The Lifetrade Fund, B.V. ("Lifetrade"), was a stockholder/investor-owned corporation organized under the laws of the Netherlands Antilles that operated as an open-ended mutual fund.  It was offered to a select group of offshore investors through an application process in a private placement via investment advisers located in Argentina, Japan and Korea. Investors from the United States were specifically barred from participation in the fund because the Lifetrade Defendants did not want to comply with the securities laws of the United States.

39.    LTrade Plus Ltd. and LTrade Fixed Capital (BVI) Ltd (collectively, the "Feeder Funds") were also stockholder/investor-owned corporations, but were organized under the laws of the British Virgin Islands and served as feeder funds for Lifetrade, allegedly investing in

bond-like, fixed-return securities issued by Lifetrade. The securities of LTrade Plus and LTrade Fixed were offered to investors in the same manner as securities in Lifetrade and all three funds are referred to collectively herein as "the Lifetrade Entities." The master-feeder structure not only allowed Smith and Marcum to market the feeder funds to separate market niches, but also allowed them to double up on fees and commissions at both the master and feeder levels. All of the investments into the Feeder Funds were invested into the master fund, Lifetrade, which made all of the investment decisions for the portfolio, and thus, for the investors in the Feeder Funds. At all relevant times, the Feeder Funds and Lifetrade essentially operated as a single enterprise. The performance and circumstances of the master fund, therefore, had a direct bearing on the performance of the Feeder Funds.

40.    None of the offerings were registered with any regulatory agency and all of the securities were offered in private placements. There was no general public offering of shares in any of the funds. Also, the securities of all three funds were illiquid and did not trade on any exchange or recognized over-the-counter market. Lifetrade itself invested exclusively in the secondary market for life insurance policies issued in the United States on the lives of U.S. citizens ("life insureds"), approximately 25 percent of whom were located in the State of New York.

## LIFE SETTLEMENTS

41.    Changing circumstances for life insurance policyholders and other factors have combined to create a secondary market for life insurance where one sells his or her life insurance policy to another person. Such transactions are referred to as "life settlements."

42.    A life settlement is a financial option for an aged policyholder (a "life insured") who wants to sell his or her life insurance policy and wishes to assign the policy

proceeds, payable upon death of the insured, to a third party (a "settlement provider") in exchange for immediate payment. The amount of the payment to the life insured exceeds the policy's surrender value but is less than the total policy benefit.

43.    Thus, the life insured is able to obtain cash during his or her lifetime, and the settlement provider (who must keep the policy in force during the life insured's lifetime by paying premiums) can, upon death of the life insured, recover more than its payment to the insured. The settlement provider will make a profit if the amount it receives when the life insured dies is greater than the sum of: (1) the amount paid to the life insured; (2) the interim premium payments made up to the point of death; (3) the settlement procedure costs (including the cost of life expectancy evaluations); (4) any fees or commissions paid to settlement brokers, and various other out-of-pocket costs; and (5) the cost of capital committed to the foregoing costs in the period between purchase of the life policies and the payment of the death benefit.

44.    Two primary factors influence the amount of a life settlement: (1) the amount of the policy proceeds at issue; and (2) the life expectancy of the insured.    The amount of the policy proceeds is already established before a life settlement takes place.    As part of the valuation process, settlement providers routinely obtain life expectancy evaluations in connection with life settlements.

45.    The amount paid by the settlement provider to purchase the right to eventually receive policy proceeds depends primarily upon the individual's life expectancy; the longer the individual is expected to live, the lower the payment will be.    The reason is clear: given the time value of money, the settlement provider will generally pay less for a benefit it must wait longer to receive. In addition, the settlement provider must pay premiums to keep the

policy in force during the individual's lifetime, thereby reducing the settlement provider's profit from the transaction as time goes on. If the individual significantly outlives his or her life expectancy, then the settlement provider can lose money in the transaction because it will have paid more in settlement funds, policy premiums and other costs than the amount of the policy's death benefit assigned to it. Life expectancy ("LE") evaluations are provided by companies such as Defendant 21st Services.

46.    The single most important factor determining both the availability of capital from investors to buy life insurance policies from life insureds and the price that can be offered to a particular policy owner in a life settlement transaction is the life expectancy of the life insured. Settlement providers such as Defendant Portsmouth Settlement Company, wholly owned by Defendant Smith, obtain information about the life expectancy of a given insured from an underwriter such as Defendant 21st Services. The underwriter effectively balances the interest of investors in accurate projections of life expectancy and the interest of policy owners in obtaining a price that fairly reflects the financial value of their insurance policies.

47.    Legitimate underwriters assess mortality risk (and, therefore, life expectancy) based on established risk classification principles. In doing so, they differentiate among different classes of insureds according to sound actuarial principles and reasonably anticipated mortality and morbidity experience. Underwriters are required to exercise sound, objective, and consistent professional judgment, and to act independently and without bias.

48.    Because both the financial return expectations of investors and the price expectations of policy owners are based on life expectancy projections generated by

underwriters, any pattern of understating life expectancy necessarily has a significant negative effect on individual settlement transactions. In particular, legitimate settlement providers lose contracts to bids based on falsely understated life expectancy projections and investors overpay for policies.

49.    Understatements of life expectancy also affect the settlement market more broadly. The willingness of investors to commit capital to fund the purchase of life insurance policies from policy owners is predicated on the assumption that underwriter-generated assessments of life expectancy are legitimate and in accordance with accepted professional standards.

## CROOKED DEALINGS OF the 21ST SERVICES DEFENDANT AND THE LIFETRADE DEFENDANTS

50.    During the period when Plaintiffs and the Class made their investments in the Lifetrade Entities (2006 through 2011), Lifetrade bought almost all of its life insurance policies from life settlement provider Portsmouth Settlement, which used 21st Services as its exclusive underwriter. On information and belief, Defendant Smith was at all relevant times during this period the indirect owner of Portsmouth Settlement and Defendant Marcum was its Chairman of the Board.[7] At the time that they made their investments, Plaintiffs were not aware, and Smith and Marcum did not disclose, this ownership structure.

---

[7] See the September 12, 2008, audit report for Portsmouth prepared by Aronson & Company submitted to the Washington State Department of Insurance, which discloses on page 8 that "During 2007 and 2006, the Company [Portsmouth] earned approximately 68% and 77%, respectively, of its revenue from one customer [Lifetrade], whose officer/majority investor [Smith] indirectly owns PSCI [Portsmouth]. See also Letter dated July 21, 2008, from Vince Wiegand, Chief Compliance Officer of Portsmouth, to the Texas Department of Insurance, enclosing a schedule listing key personnel of Portsmouth, including: "John Marcum, Chairman of Management Board. He oversees all of the company's operations as Chairman of the Board. The Vice-President, Chief Operating Officer, Chief Financial Officer and General Counsel report to the Chairman of the Board. (Please note that Portsmouth's CEO position is currently unoccupied. The departure of our CEO was reported to the Oklahoma Department of Insurance). Roy Smith, is the indirect 100% owner of Portsmouth Settlement Company I, LLC. He is not involved in the day-to-day transactions of the Company. John Marcum provides Mr. Smith updates regarding the performance of the company."

51.    As alleged in Exhibit 3, a complaint filed against 21st Century in 2004 by a life settlement provider named Coventry (a subsidiary of insurer AIG), Defendant 21st Services was widely known among insiders in the life settlement industry as early as 2004 to have been accused of systematically and significantly understating its LE evaluations in order to make it easier for unscrupulous life settlement providers like Portsmouth Settlement, acting through Smith and Marcum, to outbid competitors in the competitive market to acquire life policies from insureds.

52.    Coventry accurately predicted that investors in pools underwritten using 21st Service's information would suffer large losses, see Exhibit 3, ¶ 9, and spoke of "investors, who are duped by 21st Services' life expectancy projections into pouring money into settlement investments that are virtually guaranteed to lose significant sums." *Id.* Coventry also stated that "21st Services' falsely understated life expectancy projections systematically and significantly harm investors, potentially robbing them of their entire investment, and further put at risk the entire settlement market and the benefits it creates for policyowners." *Id.* at ¶ 40.

53.    Coventry observed that "[i]f a settlement is based on a false life expectancy, not only do investors suffer considerable losses because they paid too much for the policy, but they are also at risk of losing their entire investment . . . These losses are not realized until after the policyowner outlives the fraudulent life expectancy and, therefore, investors are generally unable to identify the fraud until a considerable time after the initial investment." *Id.*

54.    21st Services' underwriting fees were paid on a per case basis, including not just its initial evaluations, but also periodic update evaluations during the life of the policy. Moreover, 21st Services provided LEs for Lifetrade's insurance policy portfolio at least up

through August 2012. Therefore, 21st Services made more money if its fraudulent underwriting practices caused its life settlement clients to win more competitive bids and buy more policies for 21st Services to evaluate on a continuing basis. Where, as here, 21st Services' settlement provider client Smith (alter ego of Portsmouth Settlement) was spending other people's money on the LE evaluations, and was acting in the capacity of a broker paid on commission only, the fraudulent evaluations worked equally well to line the pockets of both 21st Services and Smith.

55.    The ultimate victims in this scheme were Plaintiffs, investors who had no idea that: (i) life insurance policies in which they were investing through the Lifetrade Entities were significantly overvalued (*i.e.*, the life expectancies were falsely understated); and (ii) the policies would not generate the expected cash flows required to cover Smith's undisclosed fees and commissions, service debt and provide a reasonable return on investment. Unfortunately, Plaintiffs were not aware of and had no reason to be on notice of the Coventry complaint. As Coventry stated in its complaint, and which applies with equal weight here: "when underwriters consistently and significantly understate life expectancy projections, investors suffer enormous financial losses." Exhibit 3, ¶ 6. None of the Plaintiffs would have purchased Lifetrade shares had they been informed or otherwise knew that the life expectancy evaluations of the insureds were intentionally understated.

56.    On information and belief, Plaintiffs allege that Defendant Smith, as the founder and primary investment manager of the Lifetrade Entities and the sole indirect stockholder of Portsmouth, knew about the fraudulent LE evaluations provided by Portsmouth Settlement and 21st Services as early as 2004, if not earlier, yet initiated and continued Lifetrade's business with 21st Services and Portsmouth Settlement because Smith,

and the other Lifetrade Defendants pocketed at least $100 million and possibly in excess of $200 million in self-dealing fees, commissions and other compensation in connection with the Portsmouth Settlement transactions.[8]  Certainly, both Smith and Wells Fargo knew of 21st Services' fraudulent LE reports during the months leading up to the forfeiture of the portfolio to Wells Fargo.  In a First Amendment to the Loan and Security Agreement dated June 26, 2009, Wells Fargo required that LEs issued by 21st Services prior to September 15, 2008, be adjusted by multiplying those LEs by 1.22 and that LEs issued on and after September 15, 2008 be multiplied by 1.0, signifying that LEs issued by 21st Services were known to have been understated by 22%.  In May 2012, Smith and the Lifetrade Defendants represented to investors that the value of the Fund was $451,459,040[9] (Exhibit 9), which was based in part on 21st Services' LEs.  As described *infra*, that same month, Milliman Inc. issued an independent valuation report to Wells Fargo which valued the portfolio at approximately $302 million.  The Milliman report acknowledges the known deficiencies with 21st Services' LEs, stating that Lifetrade procured "new LE calculations on most of the lives in the portfolio" and "requested" that Milliman modify its original LE assumptions "by adding 5 months to all LEs for

---

[8] These figures are based upon figures reported at page 20 of Exhibit 8 (the April 25, 2012 notice of shareholder's meeting) and in *Portsmouth Settlement Company I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010).  It appears that Smith and their entities skimmed off approximately 25% of the $370,037,565 that Lifetrade spent on acquisition of life policies or $92 million in the form of undisclosed fees, commissions and overhead charges. They also received the $41,261,422 in investment manager compensation reported at page 20 of Exhibit 8, plus $46,221,916 in "Broker Commissions" paid for distribution of the fund's securities to investors. Combined, their take from these elements is at least $133,770,813. However, there are other related-party consulting, service and hedging agreements between Lifetrade and Smith's entities that suggest the take could be as high as $239 million. A hedging agreement alone, dated September 15, 2006, may have generated revenues of $85 million for Portsmouth Securities.

[9] In fact, Smith and Lifetrade consistently and deliberately misstated the value of the portfolio to investors. For example (and in addition to the baseless "straight line" valuation method described at ¶ 85, *infra*), he utilized an 8% discount rate in computing the value of the portfolio for purposes of financial statements provided to investors. This had the intended effect of overstating the value of the portfolio in order to dupe Plaintiffs into investing, continuing their investments, or making further investments. However, Smith used higher discount rates, in the range of 12%, when computing the value of the portfolio in dealings with Wells Fargo. This, of course, produced a lower valuation, and demonstrates that both Smith and Wells Fargo knew that he was falsely representing the value of the Fund to investors. Ultimately, as described, *infra*, Smith, on behalf of the Lifetrade Defendants, and Wells Fargo represented in the Settlement Agreement that the portfolio value was equal to the outstanding debt, a patent falsehood.

the December 2011 report, and increasing this adjustment by one additional month for each subsequent monthly report...." Exhibit 22 at 14. Neither Lifetrade nor Wells Fargo notified investors of any of these adjustments or changes, notwithstanding their fiduciary duties to do so.

57.    One example of the outrageous fees, commissions and "overhead" charged by Smith and Portsmouth Settlement to Lifetrade is revealed in the reported decision in *Portsmouth Settlement* Company *I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010). It is reported there that Portsmouth Settlement was paid fees and commissions of $74,201.75 and "overhead recovery" of $30,000 on a life settlement transaction of $770,000. 2010 N.Y. Slip Op. at 8. In addition, Lifetrade's management company LMC NV, operated by Smith and Marcum, was paid $90,000 in fees not disclosed in the prospectus provided to investors. *Id.* These undisclosed fees and commissions total $194,201.75 and comprise 25.22% of the already over-priced amount that Lifetrade paid for the policy in question, thereby further reducing the odds that investors in Lifetrade would ever see a positive return on their investments.

## THE FALSE AND FRAUDULENT MISREPRESENTATIONS
## BY DEFENDANT 21ST SERVICES

58.    Throughout the course of its role as Lifetrade's life expectancy provider, 21st Services issued hundreds of false life expectancy certificates. Those certificates began at the inception of the Fund, and continued until well after ownership of the policies was transferred to the Irish entity of LT Opportunity Trust, and indeed up until at least August 2012. Throughout this period, the life expectancy certificates issued by 21st Services were falsely understated, through the scheme described in the preceding paragraphs, to the detriment of investors.

59.    These false and misleading statements by 21st Services, were made by its

underwriters whose names appear on the face of the Life Expectancy Certificates. For example:

  a.   On September 26, 2011, 21st Services underwriter Shelly Hanson issued and signed an LE certificate addressed to LT Opportunity Trust for an insured with initials "BM" indicating a mean life expectancy value of 119 months. Exhibit 14. Just over one month later, AVS (an underwriter retained by Lifetrade in 2011)[10] issued an LE certificate for *this very same insured* indicating a mean life expectancy of 142 months. Exhibit 15.

  b.   On August 29, 2011, the same underwriter for 21st Services issued an LE certificate addressed to LT Opportunity Trust for insured with initials "JO" indicating a mean LE of 72 months. Exhibit 16. Just two weeks earlier, on August 12, 2011, AVS issued an LE certificate *for this very same insured* indicating a mean LE of 99 months. Exhibit 17.

  c.   On October 25, 2011, 21st Services underwriter Dave F. [last name illegible] issued an LE certificate addressed to LT Opportunity Trust relating to an insured with initials "SR" indicating a mean LE of 54 months. Exhibit 18. Earlier that year, AVS issued an LE certificate *for this very same insured* indicating a mean LE of 111 months. Exhibit 19.

60.   On a more global basis, internal Lifetrade documents reveal 21st Services' systematic understatement of life expectancies. For example, under the 21st Services life

---

[10] Plaintiffs believe AVS was retained at that time to assist the Lifetrade Defendants in obtaining refinancing, since it was clear to Wells Fargo and others that 21st Century's LE's were demonstrably false and misleading.

expectancy representations and assumptions, in 2011 Lifetrade should have received $76,960,047 in death benefits. Applying the AVS life expectancies, by contrast, yielded only $42,272,531 in expected death benefits for that same year, an astounding discrepancy of $34,687,516. Exhibit 20, 12/30/2011 Debt Facility Presentation, at 13.

61.    In fact, the scores of LE records presently available to Plaintiffs do not reveal *a single instance* in which 21st Services issued an LE certificate that was not materially shorter than a companion LE issued by AVS. These consistent, wide-ranging and material discrepancies in LE estimations could not have been the product of chance. Rather, they evidence 21st Century's deliberate, false and misleading representations aimed at duping investors, including Plaintiffs and their advisors, to invest in Lifetrade.

62.    At all times, 21st Services enjoyed a specific and special relationship of trust and confidence with Lifetrade investors, including Plaintiffs and members of the Class.

63.    First, 21st Services knew that its understated life expectancies would be relied upon by Lifetrade investors and their advisors in making the decision to invest in Lifetrade. While it may be of small significance if a *particular* insured dies on a *particular* date, it matters very much to the profitability of a life settlement fund like Lifetrade that, overall, the life expectancies are properly calculated in accordance with professional actuarial standards and are reasonably accurate. This is because life settlement funds, by their nature and design, rely upon the pooling of many insurance policies as a way of mitigating risk and assuring the relative stability of the fund. Reasonably accurate assessment of the LE's overall, thus, ensures a steady flow of life insurance proceeds and income to the fund. Plaintiffs and their advisors knew this, and relied to their detriment upon 21st Services' false and inaccurate LE computations.

64.    Second, 21st Services also knew, or should have known, that Lifetrade shares

could be purchased only by *a limited and known group of investors* (*i.e.,* those applying for the right to purchase). The targeted investors were residents of foreign locations including, *inter alia*, Argentina, Japan, and Korea. Defendants Smith and Marcum restricted sales only to certain offshore investors who met certain specified standards designed by them, and who could demonstrate that they met those standards via an application process.

65.    Third, 21st Services knew that the incorrect information (understated LEs) provided in their Life Expectancy Certificates would be communicated by Lifetrade to investors and potential investors as a basis for the soundness of the investment. 21st Services also knew that both Lifetrade as well as ratings agencies such as S&P, would rely upon the understated LE's to issue false and misleading statements to this select group of investors concerning the propriety of an investment in the Fund. 21st Services, thus, acted as an insider or affiliate with Smith, Lifetrade and S&P, participating in the promotion of Lifetrade shares to that select group of potential investors.

66.    Further, 21st Services knew, or should have known, that its life expectancy projections were utilized as the source of statistics about life expectancies of the Lifetrade portfolio displayed in pie charts in S&P's monthly rating reports (*see* ¶¶ 73, 83, *infra*), Lifetrade's monthly fact sheets, and the Investment Consultant's reports included with Lifetrade's yearly audited financial statements.

67.    Although many of 21st Services' LEs were originally issued in the names of Portsmouth Settlement and others, 21st Services knew that the policies covered by those certificates had been acquired by Lifetrade and charged Lifetrade, or its management entities, for updates to those LEs through at least August 14, 2012.

68.    In short, 21st Services knew or should have known that its life expectancy

certificates would be relied upon by a specified group of investors to provide material information for any purchaser of Lifetrade shares. In fact, on its website, ITM TwentyFirst specifically states that it serves "life settlement investors." www.itm21st.com/about (last visited 12/6/2017). The company further touts its expertise in estimating "the average number of years a person is expected to live" based upon a number of factors www.itm21st.com/LESolutions (last visited 12/6/2017), and holds itself out as possessing unique or specialized expertise in evaluating life expectancy.

69.    Knowing that Lifetrade shares would be offered to a specific group of investors, 21st Services knowingly issued falsely short life expectancy evaluations and communicated those falsehoods to such investors through its Life Expectancy Certificates. These LE reports, which were required to launch and maintain Lifetrade, became part of the critical deal documents upon which investors were expected to and did rely.

70.    Plaintiffs and/or their investment advisors knew of the critical importance of LE's when they read the prospectus and other promotional communications and financial statements from Lifetrade. Lifetrade documents specifically set forth 21st Services' projected maturities of the insurance policies in graphs and charts to support that the underlying policies would one day produce a stream of income, and be an important hedge to traditional forms of investments. S&P ratings, which were also material to Plaintiffs' decisions to invest, also refer to maturity dates of the policies. These documents were read and reviewed by Plaintiffs and/or their advisors. Plaintiffs' advisors relied upon 21st Services LEs in recommending Lifetrade to investors, including Plaintiffs. Plaintiffs and their investment advisors relied upon those representations in deciding to make investments in Lifetrade. None of the Plaintiffs knew or had reason to know 21st Services had

understated the LEs.

71.    Plaintiffs would not have invested in Lifetrade had they known the truth about 21st Services' LE evaluations.  Thus, 21st Services' false and misleading representations caused each Plaintiff to lose the amounts invested in Lifetrade.

## S&P's FALSE AND MISLEADING ENDORSEMENT OF THE LIFETRADE SCAM

72.    Defendant S&P created and then fostered the false impression that life settlements generally, and the Lifetrade Entities in particular, were a safe investment option. S&P accomplished this by issuing, month after month from June 27, 2006 through April 2011, investment-grade ratings of "Af" for Lifetrade.  During this period, S&P had full knowledge and expectation that such ratings would be relied upon by investors and their investment advisers, including Plaintiffs and members of the class, as evidence of the safety of the investments in the Lifetrade Entities.

73.    As explained below, S&P's "Af" ratings were false and misleading.  On their face, the ratings reports represented a positive outlook for the Lifetrade Fund, with pie charts and graphs favorably depicting the Fund's past and future performance, based upon Lifetrade's and 21st Services' information about growth and longevity.  The high "Af" rating by S&P was intended to, and did, promote the Fund as a desirable investment, with limited risk.  What investors did not and could not appreciate, however, was that *S&P itself believed that life settlements were too risky to rate.*  In a 2009 non-public report, S&P described the risks inherent in life settlement investments, and stated that it had never rated such an investment – a statement belied by the glowing ratings it gave to Lifetrade both before and after that report.

74.    Lifetrade represented to its investors and potential investors that S&P's

ratings of the Fund were the product of significant due diligence into the Fund's investment quality. In a cover letter to the Fund's audited financials for the fiscal year ending August 31, 2006, Lifetrade stated: "Adding to its marketability and credibility within the financial markets, the Fund underwent a ratings analysis by Standard and Poor's which included an *audit of all aspects of operations and Fund's management*, including *physical visits* and *interviews* in the Fund's three most integral centers of operation in the United States, as well as the home office in Curacao. These due diligence trips, followed by *qualitative and quantitative* analysis, ultimately yielded the Fund a credit quality rating of 'Af.'" *See* Investment Consultant's Report for 2006 Audited Financial Statements attached as Exhibit 21 (emphasis added).[11]

75.    By August 31, 2006, some two and a half years after Lifetrade's launch, the Fund had been only moderately successful in raising capital, with total assets of $234 million. Retained by Smith to promote investments, S&P entered the picture on June 27, 2007, providing Lifetrade investment-grade ratings reports on the fund that Lifetrade used to make private placements of its securities to a select group of investors via investment advisers in Argentina, Japan, and Korea.

76.    S&P's ratings of Lifetrade were spearheaded by analysts Sergio Garibian and Sebastian Liutvinas, of S&P's Buenos Aires office.[12] These S&P Argentine officials communicated their findings and analyses to S&P headquarters in New York, which were then approved and ratified by S&P's "committee." S&P's rating "committee" in New York

---

[11] S&P continued to rate Lifetrade for years after this statement was issued. In so doing, S&P undoubtedly reviewed (or should have reviewed) the representations that were made to investors and potential investors as to its ratings. If S&P believed Lifetrade's characterization of its rating exercise to be misleading or inaccurate in some way, S&P was both able and obligated to correct these statements in any one of the subsequent ratings reports that it released, or otherwise. No such statement was issued.

[12] Lifetrade targeted Argentine investors, and operated a sales force in Argentina.

then certified the reports of Garibian and Liutvinas as "accurately reflect[ing] our committee's views regarding any and all of the subject securities or issuers." Exhibit 6 at 2. After Committee approval, S&P for years ultimately published the faulty ratings out of its New York headquarters office.

77.    S&P holds itself out as "the world's leading provider of credit ratings." https://www.spratings.com/en_US/what-we-do (last visited 11/30/17).  It touts itself as having "been in business for more than 150 years" and describes its ratings as "essential to driving growth, providing transparency and helping educate market participants so they can make decisions with confidence."  *Id.*  S&P, thus, by its own admission possessed unique or specialized expertise in evaluating Lifetrade.

78.    As such, Messrs. Garibian and Liutvinas, as well as their superiors at S&P headquarters in New York, knew their ratings were to be used for a particular purpose, that is, to evaluate the quality of the assets in the Lifetrade fund and the propriety of an investment in that Fund.  Plaintiffs were and are members of a select group of investors, which was known to S&P, as the prospectus itself indicates that the Fund operated as a private placement investment vehicle to certain investors.

79.    The private placement nature of the Lifetrade fund put S&P on notice that its ratings would be relevant only to a select group of qualified investors.  S&P, therefore, issued its ratings with the end and aim of inducing that limited group of investors to invest in Lifetrade.

80.    The plan worked.  In the Investment Consultant's Report of August 31, 2006 (Exhibit 4), Smith stated: "The Fund's management looks to fiscal 2007 with much excitement and determination. The additional exposure generated by the Fund's

improvements to structure and *certified quality* have attracted many established institutions, varying from investment banks to institutional capital sources, all with many ideas on partnerships that can further advance the Fund into the forefront of the marketplace." (Emphasis added).

81.    Some six months later, on December 31, 2007, Lifetrade's assets had doubled to $427 million from their August 31, 2006 level of $234 million. *See* 2007 audited Financial Statements attached as Exhibit 4. By December 31, 2010, Lifetrade's amount under management had doubled again to $823 million, *see* 2010 audited Financial Statements attached as Exhibit 5, reflecting the confidence that Plaintiffs and members of the Class placed in Lifetrade because of S&P's ratings.

82.    S&P's ratings were a tremendous marketing tool for the Lifetrade Defendants, and indeed, Plaintiffs and members of the class relied upon S&P's ratings reports in deciding to initially invest in Lifetrade or to continue with their investments, rather than exercise their rights of redemption.

83.    Copies of some of S&P's monthly ratings reports are attached as Exhibit 6. The rating sheets were entirely focused on Lifetrade's performance, including a pie chart showing the distribution of life expectancies for the portfolio (fraudulent information that was based on LE's from 21st Services), and a "performance chart" for historical NAV price per share that could be compared to U.S. stock and bond indexes. These visuals were used as a sham to mislead potential investors to the conclusion that the Fund was steadily growing in value and outperforming benchmark indexes. No reasonable person could read the S&P reports without concluding that S&P's favorable opinions were directed toward the performance of the Lifetrade fund itself.

84.    Missing from S&P's rating reports was any critical analysis whatsoever of: (1) the 21st Services LEs on which the performance and valuation data hinged; (2) the track record and trustworthiness of Lifetrade or its management; or (3) the data and methodology utilized by Lifetrade to establish its monthly NAV and "performance" charts.

85.    In fact, Defendant Smith had the administrator of the fund concoct the monthly NAVs using a "straight-line" method of adjusting the life expectancy of insured persons based upon the actuarially unsound premise that each insured had one less month of his life expectancy to live at the expiration of each month, thereby increasing the NAV of the fund in a straight-line progression.  An actuary formerly employed by both Wells Fargo and Lifetrade describes this straight-line valuation method as "absurd," "ridiculously bad" and "not reasonable by any actuarial standard."

86.    Astoundingly, S&P prominently published the faulty NAV graph on each of the Lifetrade ratings forms.

87.    Unlike the benchmark stock and bond prices quoted in the S&P reports, the NAVs for the fund were a creature of Defendant Smith's imagination and were not based upon market prices established through actual sales in any marketplace, whether public or over-the-counter.  Yet S&P fraudulently omitted this critical fact in making the comparison of Lifetrade's "performance" to the benchmarks for stocks and bonds.

88.    Obviously, (and contrary to the representations to investors described at ¶ 74, *supra*) S&P conducted no meaningful due diligence investigation whatsoever before commencing its ratings in June 2006; otherwise, it would have learned from industry insiders about the serious fraud allegations that had been made by Coventry about 21st Services in 2004 (Exhibit 3) and the actuarially absurd method concocted by Defendant

Smith, and endorsed by S&P, to value the fund.  It also would have learned, for example, that the man in charge of this so-called "Af" rated fund – Roy Smith – had a criminal record and a bankruptcy history, as described *supra* at ¶ 33 & fn. 7.

89.    The aforementioned problems with S&P's ratings, of course, were not and could not have been known to any Plaintiff at the time his or her investment was made. Rather, Plaintiffs relied on these ratings reports, and invariably considered the healthy industry reputation of S&P as an honest broker in the marketplace in formulating that reliance.  Nor could the fact that Plaintiffs' Lifetrade investments ultimately resulted in losses apprise investors of S&P's wrongdoing.  Rather, it is accepted in the investment community that, sometimes, even highly rated investments experience problems.

90.    What Plaintiffs could *not* and did *not* know, however, was the fact that S&P had privately, expressly disclaimed the ability to rate life settlement funds such as Lifetrade.  As mentioned above, S&P issued a non-public research report on October 13, 2009 (Exhibit 2), available only to subscribers to its paywall-protected website. Written by Winston Chang and Gary Martucci of S&P's New York office, this report stated that S&P could not rate life settlement transactions without first addressing five concerns set forth in its report, and then only after publishing criteria for rating securitizations of the life settlement asset class, something it has yet to do.  This report also stated falsely that S&P "has not to date rated a life settlement transaction."  Neither this Report, nor any accounting of it, were published in mainstream press or media reports that were likely to come to the attention of an investor of ordinary intelligence, and in fact, this Report was not known to Plaintiffs.

91.    Notwithstanding its carefully articulated reasons – quietly circulated to certain subscribers – for being wary of the safety of life settlement investments, S&P did not deem

Lifetrade's offshore investors as deserving of these same warnings. Instead, and despite S&P's grave concerns about the life settlement market, S&P gave Lifetrade high "Af" ratings beginning in July 2006, and continued thereafter to give "Af" ratings to Lifetrade through April 2011, without mentioning, let alone addressing, what it knew all along were serious risks inherent in this asset class.

92.    Reasons given by Messrs. Chang and Martucci for S&P's aversion to rating life settlement transactions included, *inter alia*: (1) a lack of statistical credibility for the actuarial assumptions underlying life settlement transactions based upon a pool of less than 1,000 lives[13]; (2) uncertainty about the potential of life settlement transactions to violate insurable interest laws, which vary from state to state; (3) concerns about the accuracy of independent medical reviews used to underwrite mortality calculations[14]; (4) concerns about the lack of track records for most life settlement originators and the alignment of their interest with that of investors, *i.e.* the potential for fraud; and (5) concerns about the timing of cash flows from life settlement transactions.

93.    All of these concerns were known or knowable to S&P during the period that it rated the Fund between June 27, 2006 and April 2011. The Argentine analysts, Messrs. Garibian and Lintvinas, prepared their reports with the New York office's assistance and approval, and the ratings were issued by the New York office. These concerns should have prevented S&P from rating the Fund in the first place. Undoubtedly, they should have been clearly communicated to investors, at the very latest, once S&P issued its subscriber-only research report on October 13, 2009.

94.    Instead, even after the 2009 report, S&P continued to issue "Af" investment-grade

---

[13] The Lifetrade fund had only approximately 236 to 500 lives insured during the period it was rated by S&P.
[14] *See* ¶¶ 58-71, *supra* re: 21st Services' LE ratings.

ratings for Lifetrade monthly through at least April 2011, without bothering to mention its subscriber-only research conclusions, and thereafter silently ceasing its ratings without explaining why.   S&P did so with full knowledge that Plaintiffs and other investors had previously relied and with the expectation that they would continue to rely upon S&P's ratings in making and keeping Lifetrade investments.   Of course, Lifetrade's investors had no reason to inquire as to whether S&P might have said different things to its subscribers, or perhaps to American investors, about the propriety of life settlement investments.   Rather, Plaintiffs were entirely justified in their reliance on the veracity of S&P's statements: that Lifetrade was deserving of a favorable "Af" rating.

95.    S&P's concerns about the risks inherent in life settlement assets – which were concealed from Lifetrade investors – proved to be well-founded.   The Lifetrade Entities lost the entire $685,835,380 raised from the putative Class of investors, less some $271,176,562 previously redeemed, together with an additional $178,000,000 that Lifetrade borrowed from Wells Fargo, for a net loss to investors of approximately $592,658,438.

96.    Through the years, S&P profited handsomely from its ratings of Lifetrade, unfortunately to the detriment of the investors.   In each report that it issued, S&P advised that its rating fees ranged from $2,500 to $100,000.   In issuing false representations about Lifetrade, S&P was motivated by its own business concerns, without regard for the truth of its representations or the harm that might be suffered by Plaintiffs and other investors.

97.    S&P's ratings were largely responsible for the success of the Lifetrade Entities in raising some $685,835,000 from offshore investors and keeping the funds of investors who made their investments before the ratings were issued.   None of the Plaintiffs would have invested in Lifetrade, or continued to invest in Lifetrade, had they been aware that S&P's various ratings of

Lifetrade were, at best, a sham, and not even believed to be reliable by S&P itself.

98.     Given its reputation, Plaintiffs expected S&P to be a trustworthy and reliable source of information about the desirability of investments generally, and of investments in Lifetrade specifically. A material consideration in deciding to invest their money in Lifetrade was the high S&P rating, which they learned of directly and/or from their investment advisor and/or from Lifetrade. Plaintiffs each understood the "Af" rating to mean that S&P endorsed Lifetrade as a solid and safe investment. They and their advisors put their confidence in S&P's "Af" rating. Plaintiffs and/or their investment advisors knew that Lifetrade touted the "Af" rating as assurance of the viability of the Fund and its prospects, and understood that the rating was based upon an in depth analysis of the Fund's performance. The S&P ratings conveyed to Plaintiffs and their investment advisors that investment in Lifetrade would be safe and likely profitable, and an important hedge to traditional forms of investments. Plaintiffs' advisors relied upon the S&P ratings in recommending Lifetrade to investors, including Plaintiffs. Plaintiffs relied upon those representations in deciding to make investments in Lifetrade. After their investment, they relied on the continued "Af" ratings in keeping their Lifetrade shares, rather than redeeming them.

99.     Plaintiffs would not have invested in Lifetrade or continued their investment had they known the truth about the S&P ratings and the fact that S&P believed life settlements were too risky to rate. Had S&P notified investors that its ratings were being withdrawn in April 2011 because of concerns that the ratings should have never been issued in the first place, Plaintiffs would have had an opportunity to redeem their investments before Wells Fargo foreclosed upon, and obtained a voluntary transfer of, Lifetrade's portfolio. Thus, S&P's fraudulent misconduct caused each Plaintiff to lose the amounts each invested in Lifetrade.

## FALSE AND FRAUDULENT MISREPRESENTATIONS AND OMISSIONS OF MATERIAL FACTS BY THE LIFETRADE DEFENDANTS

100.    All of the Prospectuses and other offering materials for the Lifetrade Entities contained false statements of material fact or failed to disclose material facts that if known to investors would have prevented them from making investments in the Lifetrade Entities.  For example, the Lifetrade Prospectus dated June 14, 2006 states "Mr. Roy G. Smith is the founder of The Lifetrade Fund B.V, he has spent his entire career in the financial services and fund management industry.  As well as CEO of the Lifetrade Fund Mr. Smith occupied the position of Deputy CEO of OSK Investment Bank Ltd, Malaysia, a fully licensed Investment Bank regulated by the Bank Negara, Malaysia.  This position was relinquished in 2005 to allow him to focus full time on developing the fund."  What the Prospectus fails to disclose is that Smith's position with OSK Investment Bank was obtained only because Lifetrade agreed to pay the investment bank $20,000 per month to serve as an investment manager, a small portion of which (4,000 Ringgit or approximately $900 per month, plus a share of profits) OSK agreed to pay to Smith as a "salary" for arranging the Investment Management Agreement.  The agreement was signed on April 1, 2005, subject to OSK verifying the actual financial position of the fund and with a disclaimer of any liability by OSK to investors in the fund.  It was promptly terminated two and a half months later by a formal termination letter from OSK, effective as of June 30, 2005.  Smith did not resign in order to focus full time on developing the fund; he was involuntarily terminated by OSK after it examined the finances of the fund and decided the fund's activities would expose it to unacceptable risks of liability to investors.

101.    Similarly, the Prospectus touted Smith's experience in financial matters, stating that "From 1988 to 1996, Mr. Smith founded his own fund management group and personally developed and operated a currency-trading program (ASTec), in which over 45 banks and

institutions participated, entrusting over $400,000,000.  Mr. Smith provides the Lifetrade Fund with an unparalleled combination of fund management and sophisticated investment market experience that the Fund holds as highly valuable."  What the Prospectus failed to report was that between July 29, 1998 and October 25, 2000, Smith was an undischarged bankrupt who served as a director of a UK corporation in violation of UK law.

102.    The Prospectus also states on page 10 that the Administrator (Equity Trust) would be paid a fee of 0.5% per annum of the NAV of the fund and that the Investment Manager (Lifetrade Management Company N.V.) would be paid a fee of 2% per annum of the NAV of the fund.  The Prospectus does not report that Smith's alter ego, Portsmouth Securities, would be paid 6% annually of the net asset value of the Class "C" (Japanese) shares for currency hedging.

103.    The Prospectus reports that Portsmouth Financial Group, the parent holding company of Portsmouth Settlement, is the "Servicing Agent & Life Settlement Provider" for the fund, but does not disclose that Smith owns Portsmouth or that any compensation would be paid to Portsmouth, despite the fact that Smith owned or would soon acquire 100% ownership in Portsmouth Financial Group, and would pay to its subsidiary Portsmouth Settlement 20% to 25% of all consideration paid by the fund to acquire life insurance policies for its portfolio.

104.    The Prospectus further states on page 12 that "save as disclosed herein, no commission or other payment will be made by The Fund in respect of application for Shares," and that "save as disclosed herein, no commission, discounts, brokerages or other special terms have been granted by The Fund prior to the date of this Document in connection with the issue or sale of any share or loan capital of The Fund."  The Prospectus nowhere disclosed that Portsmouth Securities, the alter ego and personal holding company of Smith, would receive a commission of 10% upon the sale of shares in the fund.

105.   Also, as described *supra*, the Lifetrade Defendants, acting through their alter ego Smith, devised the "straight line" method of computing the net asset value, or NAV, of the Fund, which Smith knew overstated the value and performance of the Fund.  With intent to deceive investors, prospective investors and their advisors, Smith promoted this deceptive NAV in Lifetrade's communications with investors and in the S&P ratings reports.

106.   Smith and Marcum, individually and on behalf of the other Lifetrade Defendants, falsely overstated the financial performance, prospects and viability of the Fund to Plaintiffs and their investment advisors in the Fund's annual financial statements, which were specifically directed to and Plaintiffs and the Plaintiff Class.  These financial statements were issued for the fiscal years ending December 31, 2004, August 31, 2005, August 31, 2006, December 31, 2007, December 31, 2008, December 31 2009, and for December 31 2010.  These reports fraudulently depicted the portfolio LE's, derived from the false 21st Services certificates, in graphs and pie charts, and overstated the net asset value of the fund in performance charts, to induce investor confidence.

107.   In the 2007 Investment Consultant report, published in 2008, Smith wrote about the "chaotic" conditions in the financial markets, and reassured Plaintiffs and their advisors that the "stress created a strong test of this Life Settlement model."  He stated: "I am pleased to report that to date the model has proven to be robust and strong enough to weather the storm and is truly a Non Correlated product."  He further stated that "[o]ur comfort is the supreme credit quality of the asset class and the intrinsic returns we generate. . . ."  Exhibit 4.

108.   These statements were knowingly false, as Smith concealed from Plaintiffs and their advisors that these "intrinsic returns" resulted from his erroneous "straight-line method of reporting the Fund's performance, not from actual data, or sales of the Fund's securities on the

open market.  Smith thus promoted, through his NAV approach, an illusion of stability to encourage investments and discourage redemptions.

109.    Smith's 2009 report again promoted this deception.  Smith wrote: "We said the Lifetrade Fund and Life Settlements were of high credit quality and had a very low to zero correlation to tradition equity and debt markets.  The proof is in the pudding; *today the Fund continues to be a stable performer avoiding the ups and downs of this historic period of volatility in the markets.*"  Exhibit 29.  Again, these statements were false.  Smith knew that the Fund only appeared to be stable because of his fraudulent straight line method of showing performance.

110.    Smith wrote further that "our fund is a seasoned portfolio," "unique among like funds," and able to "cherry pick. . .the best policies at the best price."  These statements were knowingly false.  As discussed above, Smith chose to use an irreputable underwriter, 21st Services, to provide overly expensive polices, from which he could and did skim large commissions and fees.

111.    Smith knew all along that Lifetrade was facing a liquidity crisis due to the impending maturity of the Wells Fargo debt, the hundreds of millions of dollars of cash he was skimming off the fund and the delay in receipt of policy proceeds due to the false LEs. Nevertheless, in his Investment Consultant Report of November 2011 for the fiscal year ended December 31, 2010, with intent to deceive Plaintiffs into keeping their investments, and making further investments, Smith concealed the true facts concerning the Fund's actual financial instability.  He falsely downplayed the liquidity risk by stating that this risk is "mitigated  … through the pooling of policies" as wells as by having "a bank line of credit."  That line of credit, of course, was imminently coming due, and proved to be the Fund's downfall.  Concealing these facts from Plaintiffs, Smith falsely wrote "The Lifetrade Fund continues to be an excellent tool to

use as port of your individual portfolio, and is invaluable in your long-term goals by being uncorrelated to the roller coaster markets that exists (sic) today." Exhibit 5.

112.    Plaintiffs and/or their investment advisors read and reviewed Lifetrade's promotional materials and/or financial statements and other direct communications to investors and prospective investors. They considered the above statements and/or similar statements made by Lifetrade to be material to the decision to invest and relied upon those statements in making their investments. None of the Plaintiffs were aware, nor could they have been, that the straight line NAV approach created by Smith and Lifetrade was unreliable as a measure of the stability of the Fund or of its performance compared to other forms of investments. None of them were aware, nor could they have been, that the LE's were grossly understated, thereby dooming the viability and profitability of the Fund. Plaintiffs further relied upon the above misrepresentations in deciding to keep their investments and/or invest further in Lifetrade.

113.    Plaintiffs would not have invested in Lifetrade, or would have redeemed their investments earlier, had the Lifetrade Defendants not concealed the truth, including but not limited to, the fact of the intentionally understated LE's, Smith's enormous fees commissions, and the deteriorating financial condition of Lifetrade. Thus, Smith's fraudulent misconduct, which is attributable to all of the Lifetrade Defendants with whom he acted in concert, caused each Plaintiff to lose the amounts each had invested in Lifetrade.

## WELLS FARGO'S CONFLICT-RIDDLED POSITION
## AS LENDER, TRUSTEE AND CUSTODIAN

114.    On June 25, 2008, Lifetrade entered into a loan and security agreement ("Loan Agreement") for a $500 million credit facility with Wells Fargo Bank's predecessor Wachovia Bank, N.A., secured by Lifetrade's life insurance policies and bank accounts. Under the Loan Agreement (section 2.6(a)), all outstanding advances were to be paid in full on or by the facility

termination date of June 25, 2011, which was subsequently extended to June 15, 2012 by a series of amendments to the Loan Agreement.

115.    Wachovia Bank failed during the 2008 financial crisis, and was merged into Wells Fargo effective October 12, 2008.  Thereafter, Wells Fargo reduced the credit facility amount to $225 million on June 28, 2009 and to $200 million on June 30, 2011.

116.    Although Plaintiffs had no knowledge of these matters at the time, upon information and belief, Wells Fargo reduced the amount available on the credit line because the bank decided it did not want to be a life settlement lender (instead preferring to operate its own, primary life settlement business using the equity of its borrowers, including Lifetrade).

117.    On March 25, 2011, Lifetrade was completely restructured in a complicated transaction that was supposedly done to avoid U.S. withholding taxes on life insurance proceeds. As part of the restructuring, Lifetrade exchanged its portfolio of life insurance policies for notes issued by Defendant LT Ireland, owned by an Irish charitable trust, and for preferred shares issued by a new Delaware corporation, Defendant LT Investment, the common stock of which was owned by Defendant Smith.

118.    As part of this transaction, two Wells Fargo affiliates, Defendants Wells Fargo Utah and Wells Fargo Delaware, obtained legal title to the Lifetrade insurance policies as trustees of a Delaware trust known as LT Opportunity Trust, which became the sole borrower under the line of credit.  Lifetrade and LT Ireland signed as guarantors.  Wells Fargo Bank was named custodian of the policies pursuant to the terms of a custodian agreement and was also given the roles of verification agent and escrow agent for the Lifetrade Entities.  Another Wells Fargo affiliate, Wells Fargo Securities, was appointed as administrative agent.

119.    In all, Wells Fargo and its affiliates held the fiduciary or contractual roles of

trustee, custodian, verification agent and escrow agent on behalf of Lifetrade and its affiliates, but at the same time held the conflicting roles of secured lender and counterparty on Lifetrade's interest-rate hedges. What is more, Wells Fargo was on both sides of the key transaction: Wells Fargo affiliates were both the borrowers (Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust) and the secured lender (Wells Fargo Bank).

## EVENTS LEADING UP TO WELLS FARGO'S FRAUDULENT TAKEOVER OF THE LIFETRADE PORTFOLIO

120.    According to Lifetrade, in or about 2010 "Wells Fargo informed Lifetrade that strategically the bank no longer wanted to provide financing to the life settlements asset class." The next year, in 2011, Don Solow (a senior Director in Wells Fargo's Client Solutions Group) stated publicly that "[a]s a general matter, Wells Fargo was looking to exit the life settlement market."

121.    This is untrue.[15]  During the period following Wells Fargo's takeover of Wachovia, it carefully analyzed the assets of its life settlement borrowers, and quite to the contrary began to concoct a plan to seize its borrower's collateral.

122.    In or around the summer of 2010, Wells Fargo had discussions with Perella Weinberg Partners – a boutique investment bank / asset management firm in New York. Perella was interested in acquiring the three life settlement loans that Wells Fargo had made, including Lifetrade.  Perella made an offer to purchase the three loans "for a hundred cents on the dollar" according to Wells Fargo's Don Solow.  This offer was not mere posturing on Perella's part, and to the contrary, was followed up with a formal offer letter, which stated: "the purchase price to be paid for the Wells Fargo notes is anticipated to be one hundred percent of the outstanding

---

[15] Wells Fargo systematically seized the life settlement portfolios of at least two other borrowers.  Today, Wells Fargo operates a business unit called the "Longevity Group," which is entirely devoted to managing the bank's life settlement assets. *See* fn. 23, *infra.*

principal amount thereof."

123.    Wells Fargo did not accept this offer.  In fact, they did not even respond to it or inform the borrower of it, instead opting to allow the offer to lapse.  The reason for this is that Wells Fargo had, at some point prior to receiving the offer, decided that the life settlement business would be a profit-center for the bank (above and beyond what it could make as lender). It thus embarked upon a scheme to appropriate Lifetrade's equity in its portfolio.

124.    Specifically, Wells Fargo declined the Perella offer because it knew that Lifetrade was at the brink of a short term liquidity crisis, which the bank could take advantage of.  Clearly, if all Wells Fargo were interested in was collecting the less than $200 million debt that was owed, it would have pursued the offer from Perella, and recouped all that was due to it from Lifetrade.  But Wells Fargo had another scheme in mind: to take over the portfolio outright and realize huge investment gains on it.

125.    The life settlement underwriter Milliman, Inc. periodically provided valuation reports of Lifetrade's portfolio to the Bank.[16]  One such report was issued on May 7, 2012, just three months prior to the execution of the Settlement Agreement.  In that report (Exhibit 22), Millman represented to its client (Wells Fargo) that the present value of the Lifetrade portfolio was more than $302,000,000 – over $100 million in excess of the amounts Wells Fargo claimed were owed to the bank under the Loan Agreement.

126.    Thus, by May 2012, Wells Fargo had concluded to a certainty, based upon Millman's estimation, that the present value of the Lifetrade portfolio of policies far exceeded

---

[16] Lifetrade also, at the urging of Wells Fargo and other potential lenders, in approximately January 2011, retained a new firm known as American Viatical Services ("AVS"), which had recently been acquired by Defendant Smith, to begin the lengthy process of re-evaluating the LE of Lifetrade's portfolio.  AVS' re-evaluations reportedly required some 16 months to accomplish because updated medical information was required for all of the life insureds.

Lifetrade's outstanding debt.[17]  With the loan maturing the following month, an opportunity presented itself to Wells Fargo to take over the portfolio by announcing a foreclosure and then forcing a contractual arrangement to secure for itself the Fund's equity over and above the debt, and the future stream of life insurance proceeds.[18]

127.    On or about March 8th and 15th, 2012 an unknown number of Plaintiffs were notified by Lifetrade that fund valuations and redemptions were being suspended for Lifetrade because, *inter alia*, the fund was a guarantor on a credit facility being re-negotiated that, if unsuccessful, would represent over 40% of the net asset value of the fund. *See* Exhibit 7.  These statements were made by Smith on behalf of the Lifetrade Entities. At this time, the outstanding debt on the Wells Fargo credit line was $178 million, plus $15 million owed for a negative mark on an interest rate hedge.  Applying simple algebra, this would indicate that the assets of the fund just months before the deal with Wells Fargo were valued at $482,500,000, confirming that Lifetrade had substantial equity in the bank's collateral and the stockholders of Lifetrade had substantial equity in their shares.

128.    On or about April 25, 2012, an unknown number of the Plaintiffs received notice from Lifetrade of a special shareholders meeting to be held on the island of Curacao in the Dutch Antilles on May 17, 2012 to consider options for dealing with the fund's expiring line of credit with Wells Fargo. See Exhibit 8.  Investors were presented with three options: Option A – a surrender of the fund's life insurance policies to Wells Fargo in payment of the debt; Option B –

---

[17] In evaluating the portfolio of LTAP (one of Wells Fargo's two other life settlement borrowers), Wells Fargo documents indicate that the bank used a 15% discount rate to ascertain the portfolio's present value.  With respect to that portfolio, Wells Fargo determined that the "risk of loss appears to be minimal based on the current estimated market value of the portfolio."

[18] Smith and Marcum, as well as the Lifetrade entities, also knew to a certainty that the portfolio value far exceeded the outstanding debt.  As early as December 2010, a Lifetrade document indicates that the value of the portfolio at that time ranged from $340,663,138 to $395,285,106.  Exhibit 23 at 13.  And, as of December 2011 Lifetrade estimated the value of the life insurance portfolio at over $451 million.  Exhibit 9 at 8.

a short-term extension of the line of credit for one year on difficult terms; or Option C – a long-term refinancing plan. Lifetrade and its insiders pushed the surrender option as the "preferred route," emphasizing that with that action "the only recourse is to the life insurance policies" and that "[i]f Wells Fargo is unable to recoup 100% of its obligations, the Fund and /or investors will not be required to fund the difference."[19] These statements were made by Smith and/or Marcum, on behalf of the Lifetrade Entities, who organized and attended the shareholder meeting.

129.    Most of the Plaintiffs did not attend the shareholders' meeting or even receive notice of it, but now understand that those who did voted for Option C, *i.e.*, for the fund to seek a long-term financing solution, and rejected Option A, *i.e.*, the idea of a surrender of Lifetrade's life insurance policies to Wells Fargo. A copy of the minutes of the meeting provided to one investor is attached as Exhibit 9. However, most of the Plaintiffs were never notified of the outcome of the meeting nor provided a copy of the minutes thereof.[20]

130.    Defendants Smith and Marcum presented a balance sheet for Lifetrade at the May 17, 2012, shareholders' meeting, which is attached to the minutes thereof, Exhibit 9, p.8, and represented that Lifetrade's policy portfolio had a present value as of December 2011 of $451,459,041. The minutes of the meeting show that Defendant Marcum stated that "The financial statements that are being sent to Wells Fargo are very detailed about the portfolio. Wells Fargo is comfortable with the numbers so far. These numbers are being used for the negotiation of the new term sheet."

131.    As the termination date of the Loan Agreement approached, the Wells Fargo Defendants knew that Lifetrade lacked the means to pay off the existing debt, as Lifetrade was in

---

[19] In reality, the investors would never have had personal liability for the Fund's debts. That is not the case as to Smith (*see* fn. 25, *infra*), who would have had substantial personal exposure in both Curacao and Ireland.
[20] This is likely due to the fact that an attachment to the minutes contains a strong criticism of Lifetrade's management by a disgruntled investor who had been tricked into making a substantial investment in the fund in late 2011, without disclosure of the fund's deepening liquidity crisis.

active negotiations with other lenders, including Bayside Capital, to provide additional short or long-term financing – options Lifetrade was pursuing in lieu of allowing Wells Fargo to foreclose on the life insurance policies.[21]

132.    On or about June 15, 2012, just a month after receiving its internal report from Milliman pegging the value of the portfolio at a minimum of $302 million, Wells Fargo ceased negotiations and announced its intention to satisfy the current outstanding debt – roughly $205 million – *by delivering to itself the existing portfolio of life insurance policies with a face value at maturity of approximately $906 million* – over four times the debt -- and a present value of as much as $451 million, at least twice the amount of the debt.

133.    Had Wells Fargo simply proceeded with the foreclosure in accordance with the Loan Agreement, following sale or maturity of the policies, it would have been required, in the normal course, to return to Lifetrade any excess sums remaining after payment of the outstanding debt, inclusive of interest, costs and fees.  Upon information and belief, as of June 2012, these excess sums totaled approximately $700,000,000 in excess death benefits at maturity and approximately $250 million in in excess present value of the portfolio.

134.    Instead, motivated by greed and the desire to utilize Plaintiffs' equity to enhance its own coffers, and in furtherance of its scheme to take control of the portfolio and operate a life settlement business in its own right, the Wells Fargo Defendants embarked upon a coercive and unconscionable series of negotiations with Roy Smith.  These negotiations culminated on August 14, 2012 in a Settlement Agreement (Exhibit 1) that gave Wells Fargo's designee, ATC, sole

---

[21]  While Lifetrade lacked the liquidity to pay down the entire outstanding debt, in fact in calendar year 2011 the Fund had been operating with a positive cash balance, even with slower than expected maturity of life insurance policies.  The Fund was meeting all of its premium payments, loan payments and fees to the Bank, and other expenses, and had positive cash inflows for that year.

ownership of the entire portfolio of life insurance policies,[22] rendered the Lifetrade Entities insolvent and stripped from Plaintiffs any prospect for recoupment of any portion of their investments.

## THE SETTLEMENT AGREEMENT

135.    On August 14, 2012, a Settlement Agreement was signed by numerous officials of the Wells Fargo Defendants, including: Christopher Young[23] (Wells Fargo Bank Northwest); Michael Thomas (ATC Realty, Wells Fargo Bank, N.A.); Justin Dardani (ATC Realty, Wells Fargo Securities LLC); and Joe Hunter (Wells Fargo Bank, N.A). It was also signed by Smith on behalf of various Lifetrade entities.

136.    The key term of the Settlement Agreement was its provision for "the Unconditional and Absolute Transfer" to Defendant ATC, on behalf of the Wells Fargo Defendants, of the entire portfolio of life insurance policies, and the provision that Plaintiffs and other shareholders "will not have any further interest or claim in and to . . . the proceeds and profits that may be derived therefrom." Exhibit 1 at 29, § 9.1. By this provision, the Wells Fargo Defendants, with Smith's blessing, misappropriated to themselves the entirety of Plaintiffs' investments. Wells Fargo also insisted upon a 16% Lender Yield expressly insisted that Smith, Marcum and Lifetrade conceal this exhorbitant interest rate from investors, including Plaintiffs. Settlement Agreement, Exhibit 1, §§ xiv and 13.13(c).

137.    The Settlement Agreement also contains false and fraudulent statements by the

---

[22] As of the time of the Settlement Agreement's execution, the portfolio of policies was held in the United States at Wells Fargo Bank, N.A.'s ABS Custody Vault. The vault is located at 1055 10th Avenue SE, Minneapolis, MN. Prior to the transfer, Plaintiffs' shares had value derived from Lifetrade's interest in this portfolio of policies. Subsequent to the Settlement Agreement, Plaintiffs' shares had no value (although Plaintiffs did not know or have reason to know that) by virtue of the transfer of the entire portfolio to ATC Realty.

[23] As recently as 2016, Mr. Young served as Vice President of the Corporate Trust Longevity Group at Wells Fargo. The main purpose of the Longevity Group is to "administer life settlement assets." ATC Realty is part of the Longevity Group at Wells Fargo. ATC's role is to invest in life settlement assets "and to maximize the return to Wells Fargo." *Sun Life Assur. Co. v. Wells Fargo Bank, NA*, No. 12-cv-05789, 2016 U.S. Dist. LEXIS 163186 (D. N.J. Nov. 16, 2016).

above-named signatories on behalf of the Wells Fargo Defendants and the Lifetrade Defendants, which each knew to be false at the time they signed the document. It articulates as a material (and false) term that the borrower "has no equity in the Collateral" and that the "current fair market value of the Collateral...is less than the amount of the obligations owing to the Lender Parties." Exhibit 1 at § 9.5. It further states that "the Borrower will receive reasonably equivalent value" for the surrendered collateral. These were knowingly false statements, a sham intended to justify what was patently a fraudulent conveyance without fair and adequate consideration. As stated above, even Wells Fargo's internal evaluations set the present value of the policy portfolio being transferred at $100 million in excess of the debt, and Smith and Marcum had represented the present value to be over $250 million in excess of the debt.

138.    In short, although the true facts were concealed from Plaintiffs at the time, Wells Fargo and its affiliates, acting as the Plaintiffs' fiduciaries, in their capacities as trustees and custodians of the life insurance policies, assumed ownership of those policies pursuant to the terms of the Settlement Agreement. While the agreement allowed the Lifetrade Entities a three and a half month option to reacquire the policies upon repayment of the debt, this too was a sham, since all parties knew from past experience that refinancing could not be accomplished in so short a time frame.[24]

139.    Smith, Marcum and the other Lifetrade Defendants consented to this arrangement without notice to the shareholders, or any attempt to reorganize Lifetrade in bankruptcy. That they did so knowing that Lifetrade had significant equity in Well Fargo's collateral and knowing also that the shareholders of Lifetrade had opposed any surrender of the policies at the shareholder's meeting on May 17, 2012, bespeaks a complete disregard for Plaintiffs and

---

[24] The provision for Wells Fargo to pay to Lifetrade a one-time contingent payment if it sold the assets to a third party within a short window, was also a sham. Attachment 1, § 11.1. The Wells Fargo Defendants had no intention to sell the policies on the market, and took no steps toward that end.

members of the class to whom Smith, Marcum and the Lifetrade Defendants owed a fiduciary duty.

140.    Smith and Marcum's conduct is believed to have been motivated by their potential liability for the Wells Fargo debt under Curacao law.[25] Based upon figures reported at page 20 of Exhibit 8 (the April 25, 2012 notice of shareholder's meeting) and in *Portsmouth Settlement* Company *I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010), it appears that Smith, Marcum and their affiliated entities skimmed off 25% of the $370,037,565 that Lifetrade spent on acquisition of life policies, or $92 million in the form of undisclosed fees, commissions and overhead charges.    They also received the $41,261,422 in investment manager compensation reported in Exhibit 8, plus the $46,221,916 in "Broker Commissions" paid to Portsmouth Securities for distribution of the fund's securities to investors.[26] Portsmouth Securities also realized approximately $85 million in fees for currency hedging in connection with Class "C" shares issued to Japanese investors.    In short, Smith and Marcum had considerable fortunes to lose if pursued for personal liability on the Wells Fargo debt.    They also sought to avoid paying premiums and other obligations of the Fund that would now fall to Wells Fargo as owners of the policies.

141.    Whatever the motive for their breach of fiduciary duty, that motive is a matter within the exclusive knowledge of Smith, Marcum and the Wells Fargo Defendants.    These

---

[25] Book 2, Article 16(1) of the Curacao Civil Code states "If, in the case of the involuntary liquidation of a legal person, there is question of a manifestly improper management which is likely to have been an important cause of the involuntary liquidation, *each director shall be jointly and severally liable* towards the insolvent estate for any shortfall, consisting of the amount of the liabilities insofar as these cannot be discharged on liquidation from the remaining assets." Article 16(9) further states that "For the purpose of this article, *a person who*, at any time during the period referred to in paragraph 8 [the three-year period preceding the involuntary liquidation or suspension of payments, which precedes it] *has determined or co-determined the policy of the legal person as if he were a director* or who manifestly acted without due care as an incorporator *shall be equated to a director*." (Emphasis added).

[26] Records of the Lifetrade Fund held by the fund administrator in Curaco demonstrate that Portsmouth Securities billed Lifetrade for commissions of 10% of all securities supposedly distributed to investors by Portsmouth Securities, which is an alter ego of Smith.

defendants, in fact, conspired to conceal their motives from Plaintiffs. An express term of the August 14, 2012 contract reads: "At no time shall the Lifetrade Parties make any statements to any persons relating to the state of mind, motivations, actions or inactions by the Lender parties." Exhibit 1 at 42.

142.    Moreover, Smith and Marcum falsely promoted the Wells Fargo deal to Plaintiffs and other shareholders. In their April 25, 2012, communication with Lifetrade investors proposing a surrender of the collateral in extinguishment of the debt (Exhibit 8), Smith and Marcum misled investors by emphasizing that "With this option, Wells Fargo will be in control of the selling process. However, the only recourse is to the life insurance policies. If Wells Fargo is unable to recoup 100% of its obligations, the Fund *and/or investors* will not be required to fund the difference." (Emphasis added). In reality, Wells Fargo never had any recourse to the shareholders of Lifetrade because they enjoyed limited liability as a result of the corporate form; the real concern here appears to have been Wells Fargo's potential recourse to Smith, Marcum and/or their affiliated entities as guarantors of the debt or directors/control persons liable under Curacao law for the debts of an insolvent legal entity.

143.    Because the face value of the policies at maturity was $905,759,403, the present value of the policies was as much as $451,459,040 and the amount of the debt was only $204,696,178, Lifetrade had hundreds of millions of dollars of equity in its portfolio. It was a fraudulent breach of the Wells Fargo Defendants' fiduciary and contractual duties as trustees and custodian to take all the life insurance policies for the banks' own benefit, excluding the Lifetrade Entities and their stockholders from any benefit of the cash flows certain to be realized as the policies matured through the deaths of the life insureds.

144.    It was also a fraudulent conveyance for less than fair value that rendered the

Lifetrade Entities insolvent, making the August 15, 2012, transfer to ATC voidable under the New York Fraudulent Conveyances Law.

145.    Because Smith and Marcum and their affiliated entities had self-dealing motives for surrender of the life insurance policies to Wells Fargo, it was a fraudulent breach of fiduciary duty for Smith, Marcum and their affiliated entities to consent to the Settlement Agreement transferring the life insurance policies to Wells Fargo.  Likewise, it was a breach of fiduciary duty for Smith and Marcum to consent to other one-sided provisions that benefited Wells Fargo alone, such as the releases, on behalf of shareholders, including Plaintiffs, of "all Claims," of "any express or implied contractual obligations," of "any fiduciary duty," and of "any defenses." Attachment 1, §§ 3.1, 5.9, 12.3.  And, it was a breach of Smith and Marcum's fiduciary duties to keep their investors in the dark about the true facts of their deal with Wells Fargo.

146.    Wells Fargo conspired with and aided and abetted the Lifetrade Defendants' breaches of fiduciary duty to Plaintiffs.  The Settlement Agreement specifically precluded the Lifetrade Defendants from making "any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement."

## DERIVATIVE ACTION ALLEGATIONS

147.    To the extent that any of the Plaintiffs' claims are purely derivative and cannot be prosecuted as direct actions on behalf of the Plaintiffs individually, demand upon the management of the Lifetrade Entities would be futile because (1) the managers and directors of the Lifetrade Entities participated in the wrongful actions described herein and cannot be expected to take any action on behalf of the entities and their shareholders against the Defendants with whom they conspired; (2) the Lifetrade Entities are now

insolvent and have no funds with which to take any action on behalf of the entities and their shareholders; and (3) the Lifetrade Entities have ceased doing business and no longer hold meetings of their managers and directors.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## ALLEGATIONS CONCERNING TIMELINESS

148.    Until recently, none of the Plaintiffs knew or had reason to suspect the fraudulent scheme perpetrated by Defendants' collective and individual acts, or that this fraud rendered their investments a total loss.  Nor did they know that the Wells Fargo Defendants were unjustly enriched by hundreds of millions of dollars of equity that rightfully belonged to the investors.

149.    Even when Lifetrade advised investors on or about March 8th and 15th, 2012 that fund valuations and redemptions were being suspended due to various issues affecting the fund's liquidity, this did not raise alarm bells about possible failure of the investments or Defendants' fraud in bringing about these circumstances.  After all, at the same time, Lifetrade advised that the firm's debts were only 40% of its assets, meaning the assets of the fund were valued in excess of $400 million.

150.    Moreover, from the outset Plaintiffs knew that life settlements by their nature are illiquid and produce income upon the future maturity of life insurance policies.  Upon making their investment in Lifetrade, the investors were informed through the Fund's prospectus that they should not expect "for their investment to be liquid" and that the Fund "is not suitable for persons who require regular income from their investments." Prospectus, Exhibit 24, at 2, 9.

151.    Additionally, following the 2008 worldwide financial crisis, Lifetrade informed its investors that the crisis "created a massive liquidity crunch" but that "the [Lifetrade] model has proven to be robust and strong enough to weather the storm and is truly a Non Correlated

product." Exhibit 4, Fiscal 2007 Audit, at 5. And in 2009, the Fund stated again that it has always "marketed the product as a buy to hold offering and explained the illiquid nature of the investment strategy." Exhibit 25, Fiscal 2008 Audit, at 6. Thus, the fact that the Fund may have experienced certain liquidity challenges as stated in the Fund's 2012 communications did not indicate signs of a systemic or fatal problem with the Fund to investors, let alone that the illiquidity was permanent, or due to any Defendant's fraud.

152. This is particularly so since the Lifetrade Defendants falsely and repeatedly reassured investors in its financial statements over the years that the Fund had a positive cash balance, and growing equity. Indeed, as late as November 23, 2011, Lifetrade's "investment consultant," controlled by Smith, emphasized how "the Lifetrade Fund continues to be an excellent tool to use as part of your individual portfolio, and is invaluable in your long-term goals by being uncorrelated to the roller coaster markets that exists today." Exhibit 5 at 4. These misrepresentations were knowingly false. They were intended to and did mislead Plaintiffs and their investment advisors to believe that the Fund was robust and would easily survive any short term difficulties.

153. Further, the Lifetrade Defendants, acting through Smith and Marcum, affirmatively and fraudulently concealed the true facts and circumstances surrounding Plaintiffs' investments. Under the terms of the Settlement Agreement of August 2012, the Lifetrade Defendants agreed, at Wells' Fargo's insistence, that it would "not make any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement. The Borrower may communicate to such investors the mere fact that settlement discussions are being conducted and may disclose that the settlement and the foreclosure occurred. . . ." Exhibit 1 at 42. In fact, no foreclosure in the

traditional sense ever took place. Instead, the Lifetrade and Wells Fargo Defendants, by and through the named signatories to the Agreement, expressly agreed to the "Unconditional and Absolute Transfer" of the entirety of the Fund's life settlement policies, and agreed that none of the shareholders would have "any further interest or claim in" the assets, or to the "proceeds and profits that may be derived therefrom." Exhibit 1 at 42.

154. These "confidentiality" provisions in the Settlement Agreement further prevented Plaintiffs from discovering the true extent of their losses, or the cause thereof. They were never advised that the value of the portfolio far exceeded the debt owed to Wells Fargo, *even by Wells Fargo's own calculations*, or that Smith and Marcum sold Plaintiffs' rights and their equity in order to relieve themselves from the prospect of personal liability.

155. The Lifetrade and Wells Fargo Defendants, by and through the named signatories to the Settlement Agreement, further conspired to conceal any information "relating to the state of mind, motivation, actions or inactions by the Lender Parties." Exhibit 1 at 42. This, too, prevented Plaintiffs from understanding that they had been duped by Defendants, who put their own self interest over the interests of Plaintiffs.

156. In short, Wells Fargo and Lifetrade conspired and agreed to keep the Plaintiffs and other members of the class in the dark about the true nature and terms of the Settlement Agreement. In so doing, the Lifetrade Defendants improperly bargained away their fiduciary duty to disclose to investors that a voluntary transfer occurred, and the Wells Fargo Defendants knowingly aided and abetted that misconduct.

157. True to the terms of the Settlement Agreement, following the execution of the Settlement, the Lifetrade Defendants continued to mislead investors into believing that the "foreclosure" was proper and necessary, and further, that it was only temporary.

158.    On August 16, 2012, LT Ireland provided notice to the Irish Stock Exchange that "The Issuer hereby gives notice that the Administrative Agent served on the Issuer (in its capacity as a guarantor under the Loan and Security Agreement) a notice of public sale dated 8 August 2012 (the "Foreclosure Notice") arising from the occurrence of certain termination events pursuant to the Loan and Security Agreement."

159.    Lt Ireland's announcement further stated that "Subsequent to the service of the Foreclosure Notice, [LT Ireland] and the Administrative Agent, as well as relevant other parties, entered into a settlement agreement (the 'Settlement Agreement') on 14 August 2012, pursuant to which a consensual foreclosure process has been agreed in respect of the various rights and obligations arising under, among others, the Loan and Security Agreement and certain other relationships and arrangements of the Issuer."

160.    About the same time, Lifetrade posted a notice on its website providing a link to the notice to the Irish Stock Exchange and stating that "The situation is that *the foreclosure issued by Wells Fargo is in accordance with the Irish structure's legal requirements.* On August 14, 2012, a settlement agreement was reached which ensures that the Fund has four months to implement a replacement line to remove Wells Fargo from the *position of collateral owner*. As per the agreement the option termination date will be November 30, 2012. *The directors are still working to achieve a satisfactory outcome for investors and will update the website with developments as they happen.*" (Emphasis added.)

161.    Thus, in the reports posted after the Settlement Agreement, the Lifetrade Defendants and the Wells Fargo Defendants continued to conceal the fact that Lifetrade had voluntarily transferred Lifetrade's life settlement portfolio to Wells Fargo. Rather, it misleadingly appeared that Wells Fargo had either *foreclosed* upon the policies or still held them

*as collateral.*

162.    Thereafter, Plaintiffs were reassured by the Lifetrade Defendants, on at least two occasions in 2013 in communications signed by Smith, that refinancing solutions for the Wells Fargo situation were being sought and, on one of these occasions, that their "continued patience" was requested. *See* Exhibit 10. This, too, was intended to, and did, lull Plaintiffs into a false sense of security that their interests were being protected by the Lifetrade Defendants, and that there was no cause for alarm.

163.    What Plaintiffs did not know or suspect was that Wells Fargo was making money on the portfolio of life insurance policies, and would continue to do so. Subsequent to the transfer of the collateral to Wells Fargo, John McFarland (Lifetrade's executive in Curacao), privately reported to Lifetrade insiders that the portfolio "is actually doing better since Wells Fargo took over, so they actually make money on it." Exhibit 26.[27]

164.    In late-2013, Smith sent a letter to Michael J. Thomas in Wells Fargo's Credit Resolution Group. Exhibit 27. That letter informed Wells Fargo that Lifetrade was in "documentation stage" of a transaction to "refinance the outstanding debt amount to Wells Fargo." Smith noted that "Wells Fargo has consistently communicated its position that the bank will not take any write downs on any transaction involving the Lifetrade Fund Portfolio" and that Smith has "always respected this and have communicated such to the parties we have engaged in the process, some of whom have tried direct contact with the bank...." Upon information and belief, that letter was not responded to.

165.    At the same time, the Lifetrade Defendants continued to lead Plaintiffs to believe that the situation was temporary, and that they were on the verge of refinancing the debt and

---

[27] McFarland went on to state, that Wells Fargo was considering selling the portfolio back to Lifetrade "*to avoid potential litigation,*" no doubt because Wells Fargo knew full well that eventually its misappropriation of the policies would result in lawsuits such as this one.

recovering the Fund's assets. On January 7, 2014, Smith sent a letter to shareholders purporting to "provide...the latest developments regarding the status of Lifetrade's refinancing efforts." Exhibit 28. Smith described "meaningful discussions" with a "potential new lender," as well as "continued dialogue with Wells Fargo Bank in re-acquiring the portfolio." *Id.* The letter described the structure of the financing, and stated that the plan "would allow us to satisfy any outstanding debt with Wells Fargo and move all the policies back into the existing Irish Lifetrade Structure." The letter further indicated that "a final version of the documents will be circulated for final approval this weekend and signed by all parties by January 30th, 2014."

166.    On October 1, 2014, Smith falsely stated in a news media interview that the fund was "close to refinancing the debt." *See* Exhibit 11.

167.    Thereafter, during 2014, 2015, and 2016, the Lifetrade Defendants, through Defendant Marcum, represented that efforts were being made to set up a new credit facility with the French bank BNP Paribas. Several Plaintiffs and class members contributed new funds of approximately $15 million to a fund organized on the island of Bermuda (the "PPF Bond Deal") that was to loan cash to the Lifetrade Fund in order to meet requirements of the French bank. From all information received by Plaintiffs and members of the class, it appeared to them that Wells Fargo was still working with Lifetrade and facilitating a refinancing transaction.

168.    By making the foregoing misrepresentations, Defendants Smith and Marcum intended to and did prevent Plaintiffs from suspecting any misconduct on the part of the Lifetrade Defendants or the Wells Fargo Defendants, and prevented Plaintiffs from discovering the truth sooner than they did.

169.    Until very recently, Plaintiffs' investments in the Lifetrade Entities were carried on the account statements many of the Plaintiffs received from their banks or brokerage firms at

the last official NAV provided by the Lifetrade Entities prior to a suspension of valuations that occurred in 2012.

170.    It was not until approximately November 21, 2016, that an unknown number of the Plaintiffs received e-mails from their brokers with attached undated letters from Lifetrade's management indicating that the fund had entered into a "contractual settlement agreement" with Wells Fargo (the date of which was not revealed); *that the bank was legally the owner of all of the life insurance policies* that formerly belonged to Lifetrade (with no information about how or when this occurred); that the Lifetrade fund held no assets; and that the investors had suffered a "*total loss.*" *See* Exhibit 12. (Emphasis added).

171.    One of the letters stated also: "It is for this reason that most banks and platforms that guard this fund have decided to assign a zero value to the NAV and assume the loss which enable the banks to remove this fund from their portfolios." *Id.* These November 2016 letters were the first communications to Plaintiffs indicating that the value of their investment had irreversibly and entirely diminished. Up until this point in time, and due to Defendants' misrepresentations and concealment, Plaintiffs believed that their Lifetrade investments continued to maintain value, and that they would receive a return on their investments at some point in the future. This belief was entirely consistent with their expectations when they invested – expectations fostered by Defendants in the first place.

172.    The Lifetrade Defendants, attempting to cover up their wrongdoing, and keep Plaintiffs from learning sooner about the fraudulent deal with Wells Fargo, did not send investors any annual reports for 2012 through 2016. It was not until on or about February 22, 2017 – three months before the initial complaint was filed – that HB Management N.V., one of the directors of Defendant LMC NV, sent a notice of annual meeting for Lifetrade, a copy of which is

attached as Exhibit 13. The February 22, 2017 notice included "drafts" of annual reports for Lifetrade for the years 2012 through 2016, which Plaintiffs had never previously seen, suggesting for the first time: (1) that Lifetrade suffered a loss of $472,210,869.14 in 2012; (2) that it had shareholders' equity of only $50,168.01 at year end 2012; and (3) that its shareholder equity disappeared completely in 2013 due to continuing losses.

173.    In short, the above facts demonstrate that none of the Plaintiffs suspected or had reason to suspect they were victims of a fraud in which the Lifetrade Defendants and the Wells Fargo Defendants acted with scienter until, at the earliest, 2016.

174.    Plaintiffs learned that Defendant S&P acted with scienter only when they paid $600 on January 24, 2017 to obtain access to S&P's paywall-protected research report attached as Exhibit 2. Only then was it clear that S&P's ratings were false, as they admittedly did not believe life settlements were ratable, due to the high level of risk.

175.    Plaintiffs first had reason to suspect fraud on the part of 21st Services only when counsel uncovered the accusations of the Coventry suit attached as Exhibit 3 and the facts set forth in *Portsmouth Settlement Company I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010). Plaintiffs were not aware, and could not have been expected to be aware, of either document. Scienter on the part of 21st services was further confirmed when counsel's investigation permitted a comparative analysis of the life expectancy certificates that 21st Services issued with respect to particular insureds, as compared with AVS or Milliman.

176.    Prior to retaining counsel, Plaintiffs did not have sufficient knowledge or information about Defendants' individual and collective wrongdoing to prepare and file a complaint meeting the pleading standards of Fed. Rule Civ. Proc. 9(b), *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007), including the requirement that they plead scienter with particularity.  These actions have been timely filed.

## COUNT I

### CONSTRUCTIVELY FRAUDULENT CONVEYANCE TO ATC AGAINST THE WELLS FARGO DEFENDANTS AND THE LIFETRADE DEFENDANTS

177.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 176, inclusive, of this Complaint.

178.    **Transfer.** The life insurance policies of Lifetrade were transferred to ATC effective August 15, 2012 under the terms of the Settlement Agreement dated August 14, 2012 attached as Exhibit 1.

179.    **Absence of Fair Consideration.** Defendant ATC paid no consideration and assumed no obligations in exchange for the transfer.  The antecedent debt of approximately $204,696,178 owed to Wells Fargo was not owed to ATC and, in any event, was not a fair consideration for the transfer because the life insurance policies had a face value of $905,759,403 in death benefits and a present value of as much as $451,459,040.

180.    **Insolvency.**  The Lifetrade Entities were insolvent or were rendered insolvent by the transfer.

181.    **Standing.**  Plaintiffs have standing to bring this claim pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr. & Cr. § 274 because they have unliquidated claims against the Lifetrade Defendants, and are thus creditors.

182.    **Violation of the New York Fraudulent Conveyance Act.**  By reason of the foregoing, the Wells Fargo Defendants and the Lifetrade Defendants have violated N.Y. CLS Dr.

& Cr. § 274.

183.    **Proximate Cause & Damages.**    As a proximate result of the fraudulent conveyance, the Plaintiffs and members of the Class have been damaged in an amount to be established at trial, constituting at a minimum the full amount of their investments.  For purposes of this Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT II

### FRAUDULENT CONVEYANCE TO ATC WITH INTENT TO HINDER, DELAY OR DEFRAUD CREDITORS AGAINST THE WELLS FARGO DEFENDANTS AND THE LIFETRADE DEFENDANTS

184.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 183, inclusive, of this Complaint.

185.    **Transfer.** The life insurance policies of Lifetrade were transferred to ATC effective August 15, 2012 under the terms of the Settlement Agreement dated August 14, 2012 attached as Exhibit 1.

186.    **Intent.** The transfer was made with actual intent to hinder, delay, or defraud present or future creditors of the Lifetrade Entities.

187.    **Standing.** Plaintiffs have standing to bring this claim pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr. & Cr. § 276, because they have unliquidated claims against the Lifetrade Defendants, and are thus creditors.

188.    **Violation of the New York Fraudulent Conveyance Act.**  By reason of the foregoing, The Wells Fargo Defendants and the Lifetrade Defendants have violated N.Y.CLS Dr. & Cr. § 276.

189.    **Proximate Cause & Damages.**  As a proximate result of the fraudulent conveyance, the Plaintiffs and members of the Class have been damaged in an amount to be

established at trial, constituting at a minimum the full amount of their investments. For purposes of this Court's jurisdiction, the damages of the Class are at least $5 million.

**COUNT III**

**UNCONSCIONABILITY OF THE WELLS FARGO LOAN AND SETTLEMENT AGREEMENTS**

190.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 189, inclusive, of this Complaint.

191.    **Contracts at Issue.**    Plaintiffs challenge herein certain provisions of the following agreements entered into between Wells Fargo and Lifetrade: First Amendment to Loan and Security Agreement dated June 26, 2009, Second Amendment to Loan and Security Agreement dated January 29, 2010, Third Amendment to Loan and Security Agreement dated June 25, 2010, Fourth Amendment to Loan and Security Agreement dated August 30, 2010, Fifth Amendment to Loan and Security Agreement dated September 23, 2010, the Omnibus Amendment dated March 28, 2011, at which date Lifetrade Ireland acceded as a Guarantor, the Sixth Amendment to Loan and Security Agreement dated June 29, 2011, the Second Omnibus Amendment dated August 4, 2011, the Seventh Amendment to Loan and Security Agreement dated September 1, 2011, the Eighth Amendment to Loan and Security Agreement dated September 30, 2011, the Ninth Amendment to Loan and Security Agreement dated November 15, 2011, the Tenth Amendment to Loan and Security Agreement dated November 29, 2011, the Eleventh Amendment to Loan and Security Agreement dated December 15, 2011, the Twelfth Amendment to Loan and Security Agreement dated January 13, 2012, and Limited Waiver and Thirteenth Amendment to Loan and Security Agreement, dated as of March 9, 2012, Fourteenth Amendment to Loan and Security Agreement, dated as of March 15, 2012, and the Settlement Agreement dated August 14, 2012 (hereinafter the "Loan & Settlement Agreements").

192.    **Procedural Unconscionability.**    Key Provisions of the Loan and Settlement Agreements are procedurally unconscionable as to Plaintiffs and the class members because they were entered into without notice to or an opportunity for investors of Lifetrade to have any input into the contract terms. Plaintiffs and members of the class received inadequate representation in the negotiation of the contracts, especially the Settlement Agreement, because the Lifetrade Defendants wished to avoid personal liability for the Wells Fargo debt and were operating with a conflict of interest.

193.    Lifetrade itself was placed in the position of negotiating loan renewal terms with Wells Fargo under duress of the 2007-2009 financial crisis and the absence of alternative lenders in the marketplace. Wells Fargo took advantage of Lifetrade's weakness to exact oppressive interest rates and other terms that almost guaranteed Lifetrade's default if it was unable to obtain alternative financing.

194.    **Substantive Unconscionability.**    The initial Lifetrade loan agreement with Wachovia on June 25, 2008, had a credit facility of $500 million at an interest rate of 3-month Libor plus 2.4%. After Wells Fargo acquired the assets of Wachovia, it cut the credit facility to $200 million and jacked up the interest rate to 3-month Libor plus 4% on June 25, 2009, 3-month Libor plus 5% on September 23, 2010, and 3-month Libor plus 9% on April 1, 2011, all at a time of historically low interest rates.

195.    Wells Fargo's purpose in increasing the interest rate to such extreme levels was to either force Lifetrade to refinance the debt elsewhere (something that was impossible under market conditions) or to force Lifetrade into default so that Wells Fargo could take over its life settlement portfolio and realize all profits for itself.

196.    The Settlement Agreement of August 14, 2012 was the culmination of this

oppressive process and is substantively unconscionable because it is completely one-sided, containing clauses that purport to waive all rights of derivative plaintiffs and bankruptcy trustees and imposed an outrageous interest rate or yield of 16% per annum that was required to be paid by Lifetrade or its investors should they be able to refinance the Wells Fargo debt with another lender. The huge yield that Wells Fargo expected and imposed guaranteed that, with the passage of time, Lifetrade and its investors would be progressively less able to refinance the debt.

197.    Accordingly, the interest rates imposed under the loan and settlement agreements were unconscionable and should be reduced by the Court to a reasonable floating rate such as the prime lending rate for purposes of calculating amounts due to Wells Fargo when the Settlement Agreement is voided pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr. & Cr., Art. 10.

198.    **Proximate Cause & Damages.**  As a proximate result of the foregoing, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

**COUNT IV**

**FRAUD - KNOWING MISREPRESENTATION BY WELLS FARGO**

199.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 198, inclusive, of this Complaint.

200.    **Misrepresentation.**  By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant Wells Fargo concealed from Lifetrade and its investors, including Plaintiffs, that in or about 2010 it received an offer to purchase the debt of Lifetrade for one hundred cents on the dollar. Wells Fargo further misrepresented to Lifetrade and its investors, including Plaintiffs, that it no longer wished to be in the life settlement lending

business, and further concealed from them its intention to appropriate to itself outright the portfolio of which it was custodian. In truth and in fact, long before 2012 Wells Fargo determined to operate its own life settlement business unit, which it later dubbed the Longevity Group, consisting of Lifetrade's portfolio and the portfolios of at least two other borrowers. Wells Fargo also knew long before the August 2012 Agreement was signed, that the Lifetrade Defendants had overvalued the Fund's policy portfolio, by relying upon falsely understated LEs, and the Wells Fargo Defendants concealed this fact from Lifetrade's investors to whom they owed fiduciary duties.

201.    **Knowledge of Falsity**. At the time it made the above representations, Defendant Wells Fargo knew that they were false.

202.    **Scienter**. Defendant Wells Fargo knew that Lifetrade and its investors would rely upon its representations, and intended that they do so. The foregoing facts alleged herein demonstrate conscious misbehavior or recklessness on the part of Wells Fargo.

203.    **Reasonable Reliance by Investors in Lifetrade**. The Plaintiffs were unaware of the falsity of Wells Fargo's representations. Plaintiffs reasonably relied upon these false representations. Had Plaintiffs known the true facts, they would have sought redemptions, and/or refrained from making further investment in the Fund, and/or otherwise sought to protect against Wells Fargo's intended seizure of the assets, and/or otherwise protect their economic interests.

204.    **Proximate Cause & Damages**. As a proximate result of the knowing misrepresentation of Defendant Wells Fargo, the Plaintiffs and members of the Class have been damaged in an amount to be determined at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT V

## NEGLIGENT MISREPRESENTATION BY WELLS FARGO

205.    **Incorporation by Reference.**    Plaintiffs re-allege paragraphs 1 through 204, inclusive, of this Complaint.

206.    **Representations by Defendant.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant Wells Fargo concealed from Lifetrade and its investors, including Plaintiffs, that in or about 2010 it received an offer to purchase the debt of Lifetrade for one hundred cents on the dollar. Wells Fargo further misrepresented to Lifetrade and its investors that it no longer wished to be in the life settlement lending business, and further concealed from them its intention to appropriate to itself outright the portfolio of which it was Custodian. In truth and in fact, long before 2012 Wells Fargo determined to operate its own life settlement business unit, which it later dubbed the Longevity Group, consisting of Lifetrade's portfolio and the portfolios of at least two other borrowers. Wells Fargo also knew, long before the August 2012 Agreement was signed that the Lifetrade Defendants had overvalued the Fund's policy portfolio, by relying upon falsely understated LEs, and the Wells Fargo Defendants concealed this fact from Lifetrade's investors to whom they owed fiduciary duties.

207.    **Falsity of Representation.** At the time it made the above representations, Defendant Wells Fargo knew that they were false.

208.    **Special Relationship of Confidence & Trust.** By virtue of (1) Wells Fargo Bank's role as Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund, (2) the roles of its affiliates Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust which held title to Lifetrade's life insurance policies, and (3) the roles of Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust, which was

the borrower on loans secured by Lifetrade's life insurance policies, Wells Fargo Bank and its affiliates Wells Fargo Utah and Wells Fargo Delaware had a special relationship of confidence and trust with Lifetrade and its shareholders which gave rise to fiduciary duties.

209. **Reasonable Reliance by Investors in Lifetrade.** The Plaintiffs were unaware of the falsity of Wells Fargo's representations. Plaintiffs reasonably relied upon these false representations. Had Plaintiffs known the true facts, they would have sought redemptions and/or refrained from making further investment in the Fund, and/or otherwise sought to protect against Wells Fargo's intended seizure of the assets, and/or otherwise protect their economic interests.

210. **Proximate Cause & Damages.** As a proximate result of the knowing misrepresentation of Defendant Wells Fargo, the Plaintiffs and members of the Class have been damaged in an amount to be determined at trial, constituting, at a minimum, the full amount of their investments. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT VI

## FRAUDULENT BREACH OF FIDUCIARY DUTY BY THE WELLS FARGO DEFENDANTS

211. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 210, inclusive, of this Complaint.

212. **Special Relationship of Confidence & Trust.** By virtue of (1) Wells Fargo Bank's role as Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund, (2) the roles of its affiliates Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust which held title to Lifetrade's life insurance policies, and (3) the roles of Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust, which was the borrower on loans secured by Lifetrade's life insurance policies, Wells Fargo Bank and its

affiliates Wells Fargo Utah and Wells Fargo Delaware had a special relationship of confidence and trust with Lifetrade and its shareholders which gave rise to fiduciary duties.

213.    **Breach of Fiduciary Duty.**  By (1) surrendering the Lifetrade life insurance policies to themselves in satisfaction of a debt owed to and by themselves, (2) ignoring self-dealing conflicts of interest on their own part and that of Smith and Marcum, (3) ignoring a special vote of the shareholders of Lifetrade opposing that action, and (4) failing to provide notice of that action to the shareholders of Lifetrade, Wells Fargo Bank, Wells Fargo Utah and Wells Fargo Delaware fraudulently breached the fiduciary duties owed to Lifetrade and its shareholders.  Wells Fargo also knew, long before the August 2012 Agreement was signed, that the Lifetrade Defendants had overvalued the Fund's policy portfolio, by relying upon falsely understated LEs, and the Wells Fargo Defendants concealed this fact from Lifetrade's investors to whom they owed fiduciary duties.

214.    **Proximate Cause & Damages.**  As a proximate result of the breach, each of the Plaintiffs and members of the Class has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

**COUNT VII**

**BREACH OF CONTRACT BY THE WELLS FARGO DEFENDANTS**

215.    **Incorporation by Reference.**  Plaintiffs re-allege paragraphs 1 through 214, inclusive, of this Complaint.

216.    **Contractual Relationships.**  Wells Fargo Bank entered into various agreements with Lifetrade by which it assumed the roles of Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund.  Wells Fargo Utah and Wells Fargo Delaware also entered into various agreements with Lifetrade by which they assumed the role of trustees and agreed to both

borrow money on behalf of Lifetrade and its affiliates and to hold title to all life insurance policies belonging to Lifetrade and its affiliates.

217. **Breach of Contractual Duties.** By (1) surrendering the Lifetrade life insurance policies to themselves in satisfaction of a debt owed by and to themselves, (2) ignoring self-dealing conflicts of interest on their own part and that of Smith and Marcum, (3) ignoring a special vote of the shareholders of Lifetrade opposing that action, and (4) failing to provide notice of that action to the shareholders of Lifetrade, Wells Fargo Bank, Wells Fargo Utah and Wells Fargo Delaware breached their contractual duties owed to Lifetrade and its shareholders.

218. **Proximate Cause & Damages.** As a proximate result of the breach, the Plaintiffs and members of the Class have been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

**COUNT VIII**

**UNJUST ENRICHMENT OF WELLS FARGO BANK**

219. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 218, inclusive, of this Complaint. They plead additionally and in the alternative, that:

220. **Defendant was Enriched.** Defendant Wells Fargo Bank is being enriched by collecting the death benefits on some $906 million in life insurance to satisfy a debt of only approximately $204,696,178 that was owed by Lifetrade.

221. **At the Plaintiffs' Expense.** Wells Fargo Bank's enrichment is at the expense of the shareholders of Lifetrade, who invested some $593 million, net of redemptions, in Lifetrade and have been deprived of the entirety of their investments.

222. **Against Equity & Good Conscience.** It is against equity and good conscience for Wells Fargo to be permitted to retain the portion of the life insurance policy death benefits that are more than the $205 million debt owed to Wells Fargo, plus its reasonable costs and interest.

223.    **Proximate Cause & Damages.**  As a proximate result of Wells Fargo's conduct, the Plaintiffs and members of the Class have been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT IX

## FRAUD - KNOWING MISREPRESENTATIONS AND CONCEALMENT OF MATERIAL FACTS BY THE LIFETRADE DEFENDANTS

224.    **Incorporation by Reference.**  Plaintiffs re-allege paragraphs 1 through 223, inclusive, of this Complaint.

225.    **Misrepresentations.**  By their words and conduct, knowing that investors in Lifetrade would rely thereon, the Lifetrade Defendants made false representations about, *inter alia,* (1) Smith prior experience as an investment banker, (2) the safety of life settlements as an asset class, (3) the life expectancy of life insureds, (4) the value of life insurance policies purchased by Lifetrade, (5) the NAV of the fund and the straight-line method used to calculate the NAV, (6) the "performance" of the fund as compared to stock and bond indexes, (7) the reasons S&P ceased rating the fund, (8) the potential liability of shareholders for the Wells Fargo debt; and (9) refinancing of the fund's debt.

226.    **Concealment.**  The Lifetrade Defendants also failed to disclose, *inter alia,* (1) Smith's prior history of bankruptcy or the criminal conviction arising from his serving as a director of a UK corporation while an undischarged bankrupt, (2) the amount of the fees, commissions and other compensation paid to them, (3) the reasons Wells Fargo Bank reduced the amount of Lifetrade's credit line and declined to renew its credit facility, (4) the potential liability of Smith and Marcum on the Wells Fargo debt as the reason they viewed a surrender of Lifetrade's policies as a preferred route for dealing with the Wells Fargo debt, (5) the fact that Lifetrade's policies were voluntarily surrendered to ATC rather than purchased by Wells Fargo

in a foreclosure sale, (6) the fact that Wells Fargo's subsidiary held Lifetrade's policies as absolute owner rather than Wells Fargo holding the policies as a custodian and trustee with a security interest in the policies as collateral, and (7) the fact that the investors had suffered a total loss of their investments.

227.    **Scienter.**  At the time they made the misrepresentations and nondisclosures, the Lifetrade Defendants knew that their statements were false and that their nondisclosures would mislead investors in Lifetrade.  The foregoing facts alleged herein demonstrate conscious misbehavior or recklessness on the part of the Lifetrade Defendants.

228.    **Knowledge of Reliance.**  The Lifetrade Defendants knew that Plaintiffs and members of the class would rely upon their false representations and concealment, and intended that they do so.

229.    **Reasonable Reliance by Lifetrade and its Investors.**  Plaintiffs and members of the class were unaware of the falsity of the Lifetrade Defendants' misrepresentations or the misleading nature of matters they concealed. Plaintiffs and members of the class reasonably relied upon the false representations and are deemed to have relied upon the nondisclosure of material facts. Had Plaintiffs and members of the class known the matters misrepresented or concealed by the Lifetrade Defendants, they would not have invested in Lifetrade and/or would have taken other action to protect their interests after making an investment.

230.    **Proximate Cause & Damages.**  As a proximate result of the knowing misrepresentations and concealment by the Lifetrade Defendants, the Plaintiffs and members of the class have been damaged in an amount to be established at trial.  For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

**COUNT X**

## NEGLIGENT MISREPRESENTATION BY THE LIFETRADE DEFENDANTS

231.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 230, inclusive, of this Complaint.

232.   **Misrepresentations.** By their words and conduct, knowing that investors in Lifetrade would rely thereon, the Lifetrade Defendants made false representations about, *inter alia,* (1) Smith's prior experience as an investment banker, (2) the safety of life settlements as an asset class, (3) the life expectancy of life insureds, (4) the value of life insurance policies purchased by Lifetrade, (5) the NAV of the fund and the straight-line method used to calculate the NAV, (6) the "performance" of the fund as compared to stock and bond indexes, (7) the reasons S&P ceased rating the fund, (8) the potential liability of shareholders for the Wells Fargo debt; and (9) refinancing of the fund's debt.

233.   **Falsity of Representation.** In truth and in fact the foregoing representations were false as, *inter alia,* Smith unsuccessfully attempted to buy himself a position as an investment banker using Lifetrade's money, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, the straight-line method of evaluating the NAV grossly overstated the performance of the Fund as compared to stock and bond indexes, shareholders were never at individual risk for the debts and obligations of the Fund, in August 2012 Wells Fargo Defendants obtained ownership of the Fund's portfolios outright, along will all profits and proceeds therefrom, and along with releases from liability, the prospect of refinancing was illusory, and the shareholders suffered a total loss of their investments.

234.   **Special Relationship of Confidence & Trust.** The Lifetrade Defendants had a special relationship of confidence and trust with shareholders in Lifetrade, including Plaintiffs,

and owed them fiduciary duties. These duties include but are not limited to: (1) the duty to protect investors and refrain from self-dealing; (2) the duty to act in the investors' best interests to preserve their rights as shareholders and to maximize their potential assets; and (3) the duty to keep investors fully apprised of the condition of their investments.

235.    **Knowledge of Reliance.**    The Lifetrade Defendants knew that Plaintiffs and members of the class would rely upon their false representations and concealment, and intended that they do so.

236.    **Reasonable Reliance by Lifetrade and its Investors.** Plaintiffs and members of the class were unaware of the falsity of the Lifetrade Defendants' misrepresentations or the misleading nature of matters they concealed. Plaintiffs and members of the class reasonably relied upon the false representations and are deemed to have relied upon the nondisclosure of material facts. Had Plaintiffs and members of the class known the matters misrepresented or concealed by the Lifetrade Defendants, they would not have invested in Lifetrade and/or would have taken other action to protect their interests after making an investment.

237.    **Proximate Cause & Damages.** As a proximate result of the knowing misrepresentations and concealment by the Lifetrade Defendants, the Plaintiffs and members of the class have been damaged in an amount to be established at trial.  For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XI

## FRAUDULENT BREACH OF FIDUCIARY DUTY BY SMITH AND MARCUM

238.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 237, inclusive, of this Complaint.

239.    **Special Relationship of Confidence & Trust.** By virtue of Smith's positions as

the founder and principal investment officer of Lifetrade and Marcum's position as the chief marketing officer and spokesman for the Lifetrade Entities, Smith and Marcum had a special relationship of confidence and trust with the Lifetrade Entities and their shareholders which gave rise to fiduciary duties. These duties include but are not limited to: (1) the duty to protect investors and refrain from self-dealing; (2) the duty to act in the investors' best interests to preserve their rights as shareholders and to maximize their potential assets; and (3) the duty to keep investors fully apprised of the condition of their investments.

240.    **Fraudulent Breach of Fiduciary Duty.**    By, *inter alia*, (1) engaging in self-dealing transactions by which they and their controlled entities, including Portsmouth Settlement, Portsmouth Securities and LMC, were allowed to make undisclosed fees and commissions; (2) knowingly using falsely understated LEs by 21st Services as the basis for evaluating the policy portfolio; (3) surrendering Lifetrade's policies to Wells Fargo Bank to avoid potential liability for themselves and their controlled entities; (4) ignoring the wishes of Lifetrade's shareholders expressed in a special shareholders' vote; (5) falsely representing the financial value of the Fund's assets to investors; (6) failing to provide clear notice to shareholders of the surrender of Lifetrade's policies to the Wells Fargo Defendants, and (7) entering into the August 14, 2012 Settlement Agreement with the Wells Fargo Defendants, which, *inter alia,* stripped Plaintiffs of the entirety of their investments, fraudulently concealed from Plaintiffs the true facts concerning their losses, and otherwise put their individual interests above those of the investors, Smith and Marcum breached their fiduciary duties owed to Lifetrade and its investors.

241.    **Proximate Cause & Damages.**    As a proximate result of the breach, the Plaintiffs and members of the class (as well as Lifetrade) have been damaged in an amount to be

established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XII

### THE LIFETRADE DEFENDANTS' VIOLATIONS OF CURACAO LAW

242. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 241, inclusive, of this Complaint.

243. **Article 6:162 of the Curacao Civil Code ("CCC"):** Article 6:162 of the Curacao Civil Code (CCC) provides that "he who commits a wrongful act against another, that can be attributed to him, is obliged to compensate the damages consequently sustained by the other."

244. **Article 6:194-6:196 of the CCC:** Article 6:194-6:196 of the CCC provides for liability on the part of "a person who with regard to goods or services, which are offered by him or the person on whose behalf he acts in the course of a profession or business, makes or has a statement made publicly known, acts wrongfully towards another acting in the course of his business if this statement is misleading in one or more respects. . . ."

245. By reason of the acts and omissions described above, The Lifetrade Defendants are liable to Plaintiffs for violations of Articles 6:162 and 6-194-196 of the CCC.

246. **Proximate Cause & Damages.** As a proximate cause of the above violations, the Plaintiffs and members of the class have been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XIII

### WELLS FARGO'S AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY BY SMITH AND MARCUM

247. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 246, inclusive, of this Complaint.

248.    **Knowledge and Scienter:** At all relevant times, Wells Fargo knew that Smith and Marcum, as the controlling persons of the Lifetrade Defendants and the persons negotiating on behalf of all Lifetrade Defendants, faced personal liability for the debts of Lifetrade, and were deeply concerned about their potential exposure and the prospects that they might lose the substantial sums they had already fraudulently skimmed from the Lifetrade Entities.

249.    Wells Fargo also knew that Smith and Marcum, as the controlling persons of the Lifetrade Defendants, owed fiduciary duties to Lifetrade investors, including Plaintiffs, that required them, *inter alia*, to act in the investors' best interests to preserve their rights as shareholders, to maximize their potential assets, to keep them fully apprised of the condition of their investments, and to refrain from self-dealing.

250.    Despite this knowledge, and in order to increase its own profits, Wells Fargo acted with intent and under facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

251.    **Inducement and Participation in Breach of Fiduciary Duties:** Notwithstanding this knowledge, Wells Fargo induced and/or participated in the breach of Smith and Marcum's fiduciary duties to Plaintiffs by playing to their personal vulnerabilities (Smith and Marcum's desire to avoid personal liability) and orchestrating a Settlement Agreement with them that both stripped Plaintiffs of all rights to their investments and fraudulently concealed from the Plaintiffs the fact that they had suffered any loss.

252.    Thus, in the Settlement Agreement, the Wells Fargo Defendants insisted "as a material inducement to the Lender to enter into this Agreement" that Smith and Marcum agree to a provision "on behalf of [Lifetrade] and its Derivative/Successor Persons" relieving Wells Fargo of "any fiduciary duty of any kind or nature whatsoever to any Lifetrade Party." Settlement

Agreement, Exhibit 1, § 5.9.

253.    Wells Fargo further insisted that Smith and Marcum, as the controlling persons of the Lifetrade Defendants, agree "on behalf of itself and its Derivative/Successor Persons" to waive "any defenses of any kind or nature whatsoever to the validity, effectiveness or enforceability" of the Settlement Agreement and accompanying documents. Settlement Agreement, Exhibit 1, § 12.3.

254.    Wells Fargo further demanded that Smith and Marcum approve the "Unconditional and Absolute Transfer" of the entirety of the insurance policies that Wells Fargo had held as collateral and that: "The Lifetrade Parties and their Derivative/Successor Persons will not have any further interest or claim in and to the Foreclosed Assets or the proceeds and profits that may be derived therefrom." Settlement Agreement, Exhibit 1, § 9.1. Although nominally the Settlement Agreement gave the Lifetrade Defendants a short window in which to re-purchase the portfolio by November 12, 2012, that provision was entirely illusory, as it was obvious to both Wells Fargo and the Lifetrade Defendants that three and a half months was an impossibly brief period in which to obtain financing elsewhere.

255.    Wells Fargo also induced Smith and Marcum, to agree to an excessive and unbargained-for Lender Yield of 16%. Settlement Agreement, Exhibit 1, § xvi.

256.    Wells Fargo further insisted that Lifetrade agree to a provision that both Lifetrade and Wells Fargo knew to be false, *i.e.*, that the fair value of the portfolio of policies was less than the debt owed to Wells Fargo. Settlement Agreement, Exhibit 1, § 9.5.

257.    By promoting the foregoing contractual provisions which heavily benefited Wells Fargo, Smith and Marcum to the detriment of investors, including Plaintiffs, Wells Fargo induced, and participated in Smith and Marcum's breach of their fiduciary duty to protect

investors and refrain from self-dealing, and provided substantial assistance to Smith and Marcum, thereby aiding and abetting that breach.

258.    In frank recognition of the unconscionable size of the 16% Lender Yield, under the circumstances, Wells Fargo expressly insisted that Smith, Marcum and Lifetrade conceal the Lender Yield from investors, including Plaintiffs. Settlement Agreement, Exhibit 1, §13.13(c). By insisting that the Lender Yield be kept secret from investors, Wells Fargo directly participated in and induced Smith and Marcum's breach of their fiduciary duty to be open and truthful with Plaintiffs about their investments, and provided substantial assistance to Smith and Marcum, thereby aiding and abetting that breach.

259.    Further promoting Smith and Marcum's breach of fiduciary obligations to Plaintiffs, Wells Fargo insisted that "the Lifetrade Parties shall not make any statements to investors . . . whether privately or publicly, relating to the settlement contemplated by this Agreement" other than certain minimal factual statements. Settlement Agreement, Exhibit 1, § 13.13(c).  Plaintiffs were kept in the dark for years about the failure of their investments precisely because Wells Fargo colluded with Smith & Marcum to keep this information from them, and provided substantial assistance to Smith and Marcum in that regard.

260.    Moreover, Wells Fargo knew that the life expectancy certificates of 21st Services were falsely understated, resulting in the overvaluation of the assets of Lifetrade by Smith and Marcum, and further knew that Smith and Marcum had concealed the truth from Plaintiffs.

261.    Wells Fargo's actions in furtherance of Smith and Marcum's breaches of fiduciary duty were knowing and intentional.  For this reason, Wells Fargo sought to conceal from investors, including Plaintiffs, any information relating to its own motivations in entering into the Settlement Agreement.  Wells Fargo insisted upon provisions in the Settlement

Agreement that expressly prevented Lifetrade from revealing "any statement to any Persons relating to the state of mind, motivation, actions or inactions by the Lender Parties [Wells Fargo]." Settlement Agreement, Exhibit 1, § 13.13(c)

262.    By reason of the foregoing, Wells Fargo is liable to Plaintiffs for aiding and abetting in the breaches of fiduciary duty by Smith and Marcum.

263.    **Proximate Cause & Damages.**    As a direct consequence of Wells Fargo's foregoing misconduct, Smith and Marcum breached their fiduciary duties to Plaintiffs (and to Lifetrade). As a proximate result of the foregoing, each Plaintiff and members of the Class (as well as Lifetrade) have been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XIV

## CIVIL RICO

264.    **Incorporation by Reference.** The allegations of paragraphs 1 through 263, inclusive, are incorporated herein by reference.

265.    **Violations of RICO.** This Count is against Defendants Smith, Marcum and the Wells Fargo Defendants (the "RICO Defendants"). At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

266.    **The RICO Enterprise:** The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Amended Complaint. Namely, through a multi-faceted campaign of lies, misrepresentations, fraud, and corruption, to coerce Lifetrade to pay hundreds of millions of dollars in excess of any debts owed to the Wells Fargo Defendants, without any consideration, and thus relieving Smith and Marcum of their

offshore personal liabilities for Lifetrade's debts to Wells Fargo and rendering Plaintiffs' investments in Lifetrade worthless.

267. **Pattern of Racketeering Activitiy:** The RICO Defendants each agreed to and did conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), for the unlawful purpose of intentionally defrauding Plaintiffs.

268. Specifically, each of the RICO Defendants entered into a conspiracy to defraud and did in fact defraud Plaintiffs and members of the Class, using the mails and wires to do so. Specifically, as detailed above, the RICO Defendants entered into a settlement agreement dated August 14, 2012 whereby the life insurance policies were surrendered to Defendant ATC. Smith, Marcum and the Wells Fargo Defendants (as trustees and custodians of the life insurance policies) knew at that time that Lifetrade shareholders had opposed surrender of the policies at the May 17, 2012 shareholders meeting. Smith, Marcum and the Wells Fargo Defendants also knew that Smith and Marcum were personally responsible for the debt, and that their willingness to have Lifetrade surrender the policies was an act of self-dealing designed to protect themselves rather than to benefit Plaintiffs, to whom they owed fiduciary duties. The RICO Defendants used the mails and wires in both negotiating and executing this agreement. Specifically, *inter alia*, Marcum (at Smith's direction) engaged in email communications with Michael Thomas, Justin Dardani, and Jeffrey Petri of Wells Fargo in negotiating the settlement agreement.[28] These individuals are all Vice Presidents at Wells Fargo, and are based in Charlotte, NC. In one such email, dated June 29, 2012, Thomas sent the draft settlement agreement to Marcum, who then circulated by email it internally among Lifetrade executives. As the settlement agreement was finalized, emails among these individuals continued over the course of July and August 2012. In

---

[28] Thomas and Dardani ultimately were signatories to the Settlement Agreement on behalf of Wells Fargo.

addition, at least two phone calls were exchanged between Michael Thomas and Marcum, on or about June 29, 2012 and August 2, 2012, the subject of which was the Settlement Agreement.

269.    As the result of the RICO Defendants' scheme, the August 14, 2012 settlement agreement transferring policy ownership hid the fact of the transfer, through an express provision that "the Lifetrade Parties shall not make any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement."    The settlement further contemplated that Wells Fargo's true motivations be shielded from the investors, providing that Lifetrade shall not make "any statements" relating to the "state of mind, motivation, actions or inactions" by the Wells Fargo entities.

270.    The settlement contained a further provision that the agreement would be terminated if any Lifetrade Party sought legal redress relating to the settlement agreement or the foreclosed assets.    This provision essentially reinstated the Wells Fargo entities' right to pursue their rights against Smith and Marcum in the event that any investor sought to enforce his rights. Thus, the RICO Defendants intended to and did in fact carry out the transfer of the life insurance policies in secret.  This was done with the sole purpose of defrauding the investor Plaintiffs, while protecting Smith, Marcum and/or their affiliated entities, who were personally responsible for the loan and who benefitted greatly from the transfer of the policies in satisfaction of the debt.

271.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of mail fraud and wire fraud.  In addition to the emails and phone calls noted above in furtherance of the fraudulent scheme which caused the illegal transfer of assets to Wells Fargo through the finalized settlement agreement, the mails and wires were further utilized to execute the August 14, 2012 settlement agreement itself.  The agreement itself expressly

contemplates execution in counterpart, which in fact took place as evidenced by the face of the execution pages. Upon information and belief, certain Wells Fargo signatories, including Michael Thomas, Justin Dardani, and Joe Hunter executed the document in North Carolina. Upon information and belief, Chris Young, who signed on behalf of LT Opportunity Trust and Wells Fargo Bank, N.A., did so in Minnesota. Upon information and belief, Smith was in Georgia when he executed the document. Upon information and belief, each of the signatory parties utilized the mails and wires to transmit their execution copies of the agreement. Upon information and belief, the mails and wires were further utilized in the negotiations leading up to finalization of the settlement agreement. As detailed above, the Settlement Agreement contained misrepresentations in furtherance of the fraudulent scheme including, *inter alia*, the false claim that Lifetrade had no equity in the collateral. The settlement agreement, once finalized and transmitted through the wires and mails, was the vehicle by which the RICO Defendants accomplished the fraudulent transfer of hundreds of millions of dollars of Lifetrade's equity to Wells Fargo, for no consideration.

272. Following execution of the settlement agreement, the RICO Defendants' continued to utilize their association-in-fact enterprise to further the scheme to defraud, and to delay investors' knowledge of it. Specifically, as noted above, in October 2014, RICO Defendant Smith further misled Plaintiffs by stating publicly that Lifetrade was "close to obtaining a new credit facility." Exhibit 11. This statement was reported in a life settlements industry publication, which Smith knew and expected would be distributed via the mails and wires, and which the Wells Fargo Defendants (as owners of significant life settlement assets) were aware.

273. The RICO Defendants continued to defraud investors, through Lifetrade, during

2014, 2015, and 2016. Smith and Marcum, through Lifetrade, used the mails and wires to fraudulently represent to investors that a new credit facility was being explored (even though Wells Fargo's subsidiary ATC already had ownership of the life insurance policies), and that efforts to seek legal recourse would destroy such efforts. Only in November 2016, some four years after the RICO Defendants first conspired to and did in fact transfer ownership of the life insurance assets to ATC, did Smith and Marcum, through Lifetrade, notify some Plaintiffs indicating that the bank was the legal owner of the policies, that the fund had no assets, and that the Plaintiff investors had suffered a total loss. During this period, and continuing to the present day, the Wells Fargo Defendants have benefitted from the ownership of the assets to the detriment of Plaintiffs. Wells Fargo continues to collect policy payouts as insureds expire, and continues to enjoy a handsome windfall at the expense of the Plaintiffs they defrauded through Lifetrade.

274.    On information and belief, Wells Fargo committed similar frauds in 2010 and 2011 against investors in life settlement pools securitized by Berlin Atlantic Capital and one other borrower, both of which had credit lines like Lifetrade's that were originated by Wachovia Securities and acquired by Wells Fargo through its acquisition of Wachovia.

275.    The Settlement Agreement entered into by Wells Fargo with Berlin Atlantic Capital is dated March 16, 2011 and is substantially like the Settlement Agreement Wells Fargo entered into on August 14, 2012, with Lifetrade. Plaintiffs do not have copies of the other borrower's settlement agreement, but believe and therefore allege that it was substantially like the agreements with Berlin Atlantic Capital and Lifetrade.

276.    Despite representing that Wells Fargo did not want to be in the life settlement business and using this as a reason for reducing the borrowers' credit lines, jacking up their

interest rates to default-type rates and refusing to renew their credit facilities, Wells Fargo has in fact gotten into the life settlement business by acquiring the policy portfolios of all three companies, holding the policies to maturity and collecting the life insurance proceeds. In essence, Wells Fargo has substituted itself for the stockholders of all three borrowers as the investor in their policy portfolios.

277.    On information and belief, Wells Fargo tricked and coerced each of its life settlement borrowers into turning over their policy portfolios to Wells Fargo or its designee so that Wells Fargo could profit from holding those policy portfolios to maturity rather than continue in Wachovia's role as a lender only.

278.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

279.    The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

280.    **Proximate Cause & Damages.** As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that Lifetrade surrendered 100% of its life settlement portfolio, to which they had not assented. Prior to the Settlement Agreement, each of these policies were ultimately owned by Lifetrade, and were housed in the United States at a Wells Fargo vault in Minneapolis, MN. The policies themselves represented the sole assets of Lifetrade, and therefore the sole basis for value in investors' shares. Upon the execution of the settlement agreement, although unbeknownst to investors, ownership of the policies was transferred to Wells Fargo. Thus, all of Lifetrade's equity evaporated and investors' shares were

rendered worthless. Because the policies were located in the United States at the time of Settlement Agreement execution, Plaintiffs have adequately pled a domestic injury.

281.    As a direct and proximate result of the foregoing, the Plaintiffs and members of the class have been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

282.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT XV

### CONSPIRACY TO VIOLATE RICO (AGAINST RICO DEFENDANTS)

283.    Plaintiffs' re-allege paragraphs 1 through 282, inclusive, of this Complaint.

284.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

285.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

286.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

287.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Lifetrade and Plaintiffs. It was part of the conspiracy that the

RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth at, *inter alia*, paragraphs 267-279, *supra*.

288.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and members of the Class have been damaged in an amount to be determined at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

289.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

**COUNT XVI**

**FRAUD - KNOWING MISREPRESENTATION BY S&P**

290.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 289, inclusive, of this Complaint.

291.    **Misrepresentation.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds. In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities. Defendant S&P itself knew that life settlement transactions were too risky to rate, but gave high "Af" ratings to Lifetrade.

292.    **Knowledge of Falsity.** Each time it made the misrepresentations about the safety and value of Lifetrade's securities, Defendant S&P knew that they were false as shown by its paywall-protected research report stating that life settlement transactions were too risky for it to rate.

293.    **Scienter.** Defendant S&P made its misrepresentations for the purpose or with the intent of having them repeated or their substance communicated to Plaintiffs. S&P knew that investors in Lifetrade would rely upon its representations, and intended that they do so. The foregoing facts alleged herein demonstrate conscious misbehavior or recklessness on the part of S&P.

294.    **Reasonable Reliance by Investors in Lifetrade.** The Plaintiffs were unaware of the falsity of S&P's representations. Plaintiffs reasonably relied upon the false representations of S&P. Had Plaintiffs known that the ratings were false, or that S&P had issued a paywall-protected report stating that life settlement transactions are too risky to rate, Plaintiffs would not have invested in the securities or would have redeemed investments previously made.

295.    **Proximate Cause & Damages.** As a proximate cause of the knowing misrepresentation of Defendant S&P, each Plaintiff and member of the Class has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

**COUNT XVII**

**FRAUD - FALSE STATEMENTS BY S&P**
**WITHOUT SUFFICIENT KNOWLEDGE OF TRUTH OR FALSITY**

296.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 295, inclusive, of this Complaint.

297.    **False Statement.** By its words and conduct, knowing that investors in Lifetrade

93

would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds.  In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities.  At all times, S&P knew life settlement investments to be too risky to rate, but gave high "Af" ratings to Lifetrade.  These misrepresentations were never withdrawn or corrected, and continue to this day.

298.    **Absence of Knowledge of Truth or Falsity.** At the time S&P made its initial false statements about the safety and performance of Lifetrade's securities on June 27, 2006, if S&P did not yet know that the securities were too risky to rate, it nevertheless acted without a sufficient investigation to permit it to know whether its statements were true or false. That is, Defendant S&P had no idea of the safety or value of Lifetrade's securities, and had not made sufficient inquiry to know one way or the other, yet made the representations anyway.

299.    **Scienter.** Defendant S&P knew that investors in Lifetrade would rely upon its representations, and intended that they do so.  The foregoing facts alleged herein demonstrate conscious misbehavior or recklessness on the part of S&P.

300.    **Reasonable Reliance by Investors in Lifetrade.** The Plaintiffs were unaware of the falsity of S&P's statements. Plaintiffs reasonably relied upon the false statements of S&P. Had Plaintiffs known that S&P, in reality, had no idea about the safety or value of Lifetrade's securities, Plaintiffs would not have invested in the securities or would have redeemed investments previously made.

301.    **Proximate Cause & Damages.**  As a proximate cause of the false statements, each Plaintiff has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XVIII

### NEGLIGENT MISREPRESENTATION BY S&P

302.    **Incorporation by Reference.**  Plaintiffs re-allege paragraphs 1 through 301, inclusive, of this Complaint.

303.    **Representations by Defendant.**  By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds.

304.    **Falsity of Representation.**  In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities. These misrepresentations were never withdrawn or corrected, and continue to this day.  The high "Af" ratings were false in that they did not comport with professional standards and good and accepted practices governing ratings agencies like S&P.  At all times, S&P believed life settlement investments to be too risky to rate, but gave high "Af" ratings to Lifetrade.

305.    **Special Relationship.**  Plaintiffs had a "special relationship" with S&P, in that S&P (1) intended their ratings would be used to evaluate the Lifetrade investment; (2) intended that Plaintiffs – members of a select group of offshore investors – would rely on their ratings to

evaluate the investment; and (3) prepared their ratings with the end and aim of inducing investors such as the Plaintiffs to invest.

306. **Reliance by Known Party or Parties in Furtherance of Purpose.** The Plaintiffs reasonably relied upon the false statements of S&P. Had Plaintiffs known that S&P, in reality, had no idea about the safety or value of Lifetrade's securities or in fact knew the securities were too risky to rate, Plaintiffs would not have invested in the securities or would have redeemed investments previously made.

307. **Proximate Cause & Damages.** As a proximate result of the false statements, each Plaintiff has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XIX

## FRAUD - KNOWING MISREPRESENTATION BY 21ST CENTURY

308. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 307, inclusive, of this Complaint.

309. **Misrepresentation.** By its words and conduct, knowing that Lifetrade and its investors would rely thereon, Defendant 21st Services made false representations about the life expectancy of life insureds who engaged in life settlement transactions with Portsmouth Settlement that were to be assigned to Lifetrade.

310. **Knowledge of Falsity.** At the time it made the misrepresentations, Defendant 21st Services knew that they were false and grossly understated the life expectancies of the insured persons.

311. **Scienter.** Defendant 21st Services made its misrepresentations for the purpose or with the intent of having them repeated or its substance communicated to Plaintiffs. 21st

Services further knew that Lifetrade and its investors would rely upon its representations, and intended that they do so. The foregoing facts alleged herein demonstrate conscious misbehavior or recklessness on the part of 21st Services.

312. **Reasonable Reliance by Lifetrade and its Investors.** Plaintiffs (and Lifetrade and its investors) were unaware of the falsity of 21st Services representations. Plaintiffs reasonably relied upon the false representations of 21st Services. Had Plaintiffs known that 21st Services was providing fraudulent life expectancy evaluations, Plaintiffs would not have invested in the securities, or would have redeemed their investments or otherwise protected their rights.

313. **Proximate Cause & Damages.** As a proximate result of the knowing misrepresentations of Defendant 21st Services, each Plaintiff and member of the Class has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

### COUNT XX

### CONSPIRACY TO COMMIT FRAUD BY 21st SERVICES AND THE LIFETRADE DEFENDANTS

314. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 313, inclusive, of this Complaint.

315. **Conspiracy to Defraud.** As alleged in detail above, Defendant 21st Services and its co-conspirators, Portsmouth Settlement and Smith, knowingly and/or recklessly, agreed and/or confederated by common design and conspired by common design to make materially false and misleading statements and engage in a fraudulent scheme for the purpose of inducing Plaintiffs to invest in Lifetrade.

316. **Reasonable Reliance by Lifetrade and its Investors.** Plainitffs (as well as Lifetrade) were unaware of the falsity of 21st Services' representations made by agreement with

Portsmouth Settlement and Smith. Plaintiffs reasonably relied upon the false representations. Had Plaintiffs known that 21st Services was providing fraudulent life expectancy evaluations, Plaintiffs would not have invested in the securities, or would have redeemed their investments or otherwise protected their interests.

317.    **Proximate Cause & Damages.** As a proximate cause of the knowing misrepresentations of Defendants 21st Services, each Plaintiff and member of the Class has been in an amount to be established at trial.  For purposes of the Court's jurisdiction, the damages of the Class are at least $5 million.

## COUNT XXI

## NEGLIGENT MISREPRESENTATION BY 21ST SERVICES

318.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 317, inclusive, of this Complaint.

319.    **Representations by Defendant.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant 21st Services negligently provided incorrect information through its representations about the life expectancy of life insureds who engaged in life settlement transactions with Portsmouth Settlement that were to be assigned to Lifetrade.

320.    **Falsity of Representations.** The representations were false because they did not comport with professional standards, including good and accepted actuarial practices, and systematically under-estimated the life expectancy of the life insureds.

321.    **Special Relationship.** Plaintiffs (and Lifetrade) had a "special relationship" with 21st Services, in that 21st Services (1) intended their life expectancy evaluations would be used to value life policies that Portsmouth Settlement purchased on behalf of Lifetrade; (2) intended that Portsmouth Settlement and Lifetrade would rely on their life expectancy evaluations to value the

life insurance policies and solicit investments from Plaintiffs; (3) prepared their life expectancy evaluations with the end and aim of permitting Portsmouth Settlement and Lifetrade to outbid other bidders for the policies, and induce investors to invest; (4) intended that Plaintiffs – members of a select group of offshore investors – would rely on their LE representations to evaluate the investment; and (5) prepared their LE representations with the end and aim of inducing investors such as the Plaintiffs to invest.

322.  **Reliance by Known Party or Parties in Furtherance of Purpose.** Plaintiffs, (as well as Portsmouth Settlement and Lifetrade) reasonably relied upon the false statements of 21st Services. Had Lifetrade known that 21st Services was understating the life expectancies, it would not have purchased the life settlements in question. Had Plaintiffs known that 21st Services was understating the life expectancies of the insureds, they would not have invested in Lifetrade, or would have redeemed their investments or otherwise protected their interests.

323.  **Proximate Cause & Damages.** As a proximate cause of the negligent misrepresentations, each Plaintiff and member of the Class has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, damages of the Class are at least $5 million.

## COUNT XXII

### VIOLATION OF ARGENTINE CONSUMER PROTECTION LAW 24240 AND MODIFIERS (AGAINST ALL DEFENDANTS)

324.  Plaintiffs re-allege paragraphs 1 through 323, inclusive, of this Complaint.

325.  The aforesaid misconduct constitutes a violation of the provisions of the Argentine Consumer Protection Law 24240 and its modifiers.

326.  As a proximate cause of this misconduct, each of the Plaintiffs has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, damages of the

Class are at least $5 million. Pursuant to this section, Plaintiffs are entitled to recover punitive damages.

### COUNT XXIII

### NEGLIGENT AND INTENTIONAL ACTS UNDER UNDER ARGENTINE LAW (AGAINST ALL DEFENDANTS)

327.    Plaintiffs re-allege paragraphs 1 through 326, inclusive, of this Complaint.

328.    Pursuant to § 1109 of the Argentine Civil Code, Defendants have each "perform[ed] an act, which by his fault or negligence caus[ed] damage to" each of the Plaintiffs.

329.    The afore-described negligent and intentional acts of misconduct by each of the Defendants constitute violations of § 1109.

330.    As a proximate result of the foregoing, each of the Plaintiffs has been damaged in an amount to be established at trial. For purposes of the Court's jurisdiction, damages of the Class are at least $5 million.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief individually and on behalf of the class:

a)    A judgment against the Lifetrade Defendants and the Wells Fargo Defendants rescinding the fraudulent conveyance of Lifetrade's life insurance policies and other assets to ATC pursuant to the New York Fraudulent Conveyance Act, and/or providing an appropriate equitable remedy, such as restitution, and damages;

b)    A judgment against Wells Fargo annulling certain provisions of its loan agreements and the Settlement Agreements as unconscionable and unenforceable;

a)    Awards of compensatory damages in amounts to be determined at trial against the Lifetrade Defendants, the Wells Fargo Defendants, S&P and 21st Services

resulting from their wrongful conduct and breach of their legal, contractual and fiduciary duties;

b)  Awards of punitive damages against the Lifetrade Defendants, the Wells Fargo Defendants, S&P and 21st Services;

c)  An award of treble damages against the Wells Fargo Defendants, Smith and Marcum pursuant to RICO;

d)  An award of pre-judgment and post-judgment interest against all Defendants to the extent allowed by law;

e)  An award of all costs and expenses of prosecuting this action against all Defendants, including fees and costs reasonably incurred to the extent allowed by law;

f)  An award of attorney's fees against the Lifetrade Defendants and the Wells Fargo Defendants pursuant to the New York Fraudulent Conveyance Act;

g)  An award of attorney's fees against the Wells Fargo Defendants, Smith and Marcum pursuant to RICO;

h)  Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims alleged herein so triable.

Dated: March 19, 2018
New York, New York

Respectfully submitted,

**PHILLIPS & PAOLICELLI, LLP**

By: _____
William Mack (WM-7786)
WMack@p2law.com

Steven Phillips (SP-9658)
SPhillips@p2law.com

Diane Paolicelli (DP-3067)
dpaolicelli@p2law.com

747 Third Avenue
New York, N.Y. 10017
Telephone: (212) 388-5100


**WATERS & KRAUS, LLP**
Wm. Paul Lawrence, II
 (*Pro Hac Vice* application forthcoming)
plawrence@waterskraus.com
Washington D.C. Metro Office
37163 Mountville Rd.
Middleburg, VA 20117
Telephone: (540) 687-6999
Fax: (540) 687-5457

Charles Siegel
(*Pro Hac Vice* application forthcoming)
siegel@waterskraus.com
3141 Hood Street, Suite 700
Dallas, TX 75219
Telephone: (214) 357-6244
Fax: (214) 357-7252